[Cite as *State v. Cochran*, 2017-Ohio-216.]

**IN THE COURT OF APPEALS OF OHIO**
**SECOND APPELLATE DISTRICT**
**MONTGOMERY COUNTY**

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | C.A. CASE NO. 27023 |
| | : | |
| v. | : | T.C. NO. 14CR1930 |
| | : | |
| JOHN M. COCHRAN | : | (Criminal Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

**O P I N I O N**

Rendered on the ___20th___ day of ____January____, 2017.

. . . . . . . . . . .

MEAGAN D. WOODALL, Atty. Reg. No. 0093466, Assistant Prosecuting Attorney, 301 W. Third Street, 5th Floor, Dayton, Ohio 45422
     Attorney for Plaintiff-Appellee

KIRSTEN KNIGHT, Atty. Reg. No. 0080433, P. O. Box 137, Germantown, Ohio 45327
     Attorney for Defendant-Appellant

. . . . . . . . . . . .

FROELICH, J.

{¶ 1} John M. Cochran was found guilty by a jury of three counts of murder, two counts of felonious assault, and disrupting public services. All of the charges stemmed from the fatal stabbing of Mark Gershon. The trial court merged the murder and felonious assault charges, and sentenced Cochran to 15 years to life in prison for purposeful murder, in violation of R.C. 2903.02(A). The court imposed 18 months for disrupting

public services, to be served concurrently with the sentence for murder.

{¶ 2} Cochran appeals from his conviction, claiming that his conviction was based on insufficient evidence and was against the manifest weight of the evidence.   He argues that there was "an overwhelming amount of testimony" about his "mental illness" and that the jury lost its way when it failed to find him not guilty by reason of insanity.

{¶ 3} For the following reasons, the trial court's judgment will be affirmed.

## I. Applicable Standards of Review

{¶ 4} "A sufficiency of the evidence argument disputes whether the State has presented adequate evidence on each element of the offense to allow the case to go to the jury or sustain the verdict as a matter of law."   *State v. Wilson*, 2d Dist. Montgomery No. 22581, 2009-Ohio-525, ¶ 10, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 5} In contrast, "a weight of the evidence argument challenges the believability of the evidence and asks which of the competing inferences suggested by the evidence is more believable or persuasive."   *Wilson* at ¶ 12. *See Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (" 'manifest weight of the evidence' refers to a greater amount of credible evidence and relates to persuasion").   When evaluating whether a conviction is against the manifest weight of the evidence, the appellate court must review the entire record, weigh the evidence and all reasonable inferences, consider witness credibility, and determine whether, in resolving conflicts in the evidence, the trier of fact "clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered."   *Thompkins*, 78 Ohio St.3d at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st

Dist.1983).

{¶ 6} Because the trier of fact sees and hears the witnesses at trial, we must defer to the factfinder's decisions whether, and to what extent, to credit the testimony of particular witnesses. *State v. Lawson*, 2d Dist. Montgomery No. 16288, 1997 WL 476684 (Aug. 22, 1997). However, we may determine which of several competing inferences suggested by the evidence should be preferred. *Id.* The fact that the evidence is subject to different interpretations does not render the conviction against the manifest weight of the evidence. *Wilson* at ¶ 14. A judgment of conviction should be reversed as being against the manifest weight of the evidence only in exceptional circumstances. *Martin* at 175.

{¶ 7} The defendant bears the burden of establishing affirmative defenses, including the defense of not guilty by reason of insanity. R.C. 2901.05(A). *See State v. Tibbetts*, 92 Ohio St.3d 146, 164-165, 749 N.E.2d 226 (2001). An insanity defense requires proof that, "at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." R.C. 2901.01(A)(14). The defense must be proven by a preponderance of the evidence. R.C. 2901.05(A); *Tibbetts* at 165. "Preponderance of the evidence simply means 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.' " *In re Starks*, 2d Dist. Darke No. 1646, 2005-Ohio-1912, ¶ 15, quoting Black's Law Dictionary 1182 (6th Ed.1998).

## II. Evidence Presented At Trial

{¶ 8} The underlying facts of this case are not in dispute. The State's evidence at trial established that, at approximately 5:00 p.m. on May 28, 2014, Mark Gershon called

911 from the bedroom of his home regarding his housemate, Cochran. While that call was in progress, Cochran fatally stabbed Gershon while Gershon was lying on his (Gershon's) bed. Cochran inflicted numerous stab wounds to Gershon's chest and pelvic/groin areas. Another housemate, Brian ("Seth") Bennett, was present when the stabbing occurred, tried to intercede, and called the police after Cochran "interrupted" the call from Gershon's phone. Cochran left the residence in his truck before the police arrived. Cochran returned to the residence at approximately 5:40 p.m. and was arrested without incident.

{¶ 9} The primary focus of the trial was Cochran's mental state at the time of the offense. Although the State correctly told the jury during closing argument that it was not required to prove motive, the State's theory was that Cochran had killed Gershon because Cochran was angry that Gershon was going to call the police to remove him (Cochran) from the home. In contrast, Cochran asserted that the murder was the result of a severe mental illness that rendered him unable to appreciate the wrongfulness of his actions.

*The State's Case-in-Chief*

{¶ 10} The State's evidence regarding Cochran's mens rea was primarily provided by Bennett, who knew both Cochran and Gershon for several years and was present during the stabbing. Bennett testified that he met and began dating Cochran in Michigan. After the two broke up in March of 2009 or 2010, Cochran moved to the Dayton area, and he (Cochran) began to reside with Gershon and another man, John Calina, in Gershon's apartment. Cochran was a caregiver for Gershon, who had serious medical issues; Cochran drove Gershon around, cooked, cleaned, and assisted with Gershon's medical needs. In return, Cochran received free room and board from Gershon. Bennett

periodically visited Cochran at the apartment and developed a friendship with Gershon.

{¶ 11} On July 20, 2011, Bennett moved to the Dayton area and moved in with Gershon, Cochran, and Calina. Calina moved out on September 1st. Bennett began helping with the dogs that lived at the residence, but did not help out otherwise. Cochran continued with his caregiving duties.

{¶ 12} In 2012, Gershon purchased a home, and Cochran and Bennett moved with him. Cochran continued with his caretaking duties, plus mowed the lawn. Gershon provided free room and board to Bennett and Cochran, and he paid for utilities, groceries, phone service, cell phone service, internet, cable, computers, and televisions for the household.

{¶ 13} For much of April 2014, Gershon was hospitalized due to ongoing health issues. Cochran had few responsibilities during this time.

{¶ 14} When Gershon returned from the hospital in May 2014, Cochran drove Gershon around on occasion, but he did less to care for Gershon. Bennett stated that, "toward the end," Cochran did not treat Gershon "with respect"; Cochran would not make food when asked or drive Gershon around. Bennett recalled that Calina was planning to move back into Gershon's home in June or July 2014.

{¶ 15} Bennett testified that, on May 28, 2014, Cochran drove Gershon to the doctor's office to retrieve medicine that had been left behind the previous day. The pair was gone for two or three hours. When they returned, Bennett observed that both were "extremely agitated," "red in the face," and breathing heavily. Bennett observed that Gershon had what appeared to be claw marks on his neck and a knot on his head; Cochran appeared to be fine. Bennett helped Gershon find his (Gershon's) glasses,

which were behind the front passenger seat and had bent frames. After entering the house, Gershon told Bennett that Cochran had "beat the hell out of [him]." Gershon stated that he was going to call the police to have Cochran removed. Both men went into their respective bedrooms.

{¶ 16} Within a few minutes, Cochran came into Bennett's room and asked if Gershon was calling the police. Bennett did not answer, but Cochran answered the question himself, saying, "Yes, he is." Cochran left Bennett's room. After about a minute, Bennett heard Cochran kick in the door to Gershon's bedroom; Gershon was already on the phone with a police dispatcher.

{¶ 17} Upon entering Gershon's bedroom, Cochran began to stab Gershon, two-handed, with a dagger that Cochran kept in his bedroom. Bennett tried to stop Cochran, and at one point grabbed the blade, but he was unable to stop the assault. Bennett also picked up Gershon's phone, which Gershon had dropped when the stabbing began, and attempted to continue the call; Cochran smacked the phone and "interrupted" the call. After Cochran concluded his assault on Gershon, he went to the bedroom door and said, "I've done it. I've killed Mark Gershon." Cochran left the home in his dark green pickup truck. Cochran returned home at approximately 5:40 p.m. and was arrested.

*Evidence Supporting Cochran's NGRI Plea*

{¶ 18} The evidence in support of Cochran's not guilty by reason of insanity defense consisted of additional testimony from Bennett, as well as testimony from police officers, family members, and jail personnel.

{¶ 19} On cross-examination, Bennett testified that Cochran had added extra locks to his bedroom door, and he had a control panel for a home alarm system in his room,

although Bennett reported that the alarm was not operational. The alarm system had features that would alert if someone entered Cochran's bedroom or moved within it. The dagger that Cochran used for the stabbing was kept between his bedframe and his mattress. Cochran's room also contained a safe.

**{¶ 20}** Bennett further testified that Cochran believed that Gershon had arranged with a dentist to have a microchip placed in his (Cochran's) teeth. Cochran had once indicated to Bennett that he (Cochran) believed that Gershon was a member of the CIA. Bennett agreed with defense counsel that these concerns sounded paranoid.

**{¶ 21}** Bennett testified that Cochran had anger issues, and that he (Bennett) had encouraged Cochran to receive counseling; Cochran resisted those suggestions. Bennett stated that Cochran had "very high highs and very low lows," and Bennett questioned whether Cochran had bipolar disorder. Bennett also stated that Cochran was depressed because he was not in a relationship.

**{¶ 22}** Sergeant David Pelkey was one of the first responders to Gershon's residence after the stabbing. He testified that he was outside the house when Cochran returned to the residence at approximately 5:40 p.m. Pelkey described Cochran's demeanor as "relaxed" and "seemed fine." Cochran was cooperative and did not appear to be upset or angry. Pelkey reported that Cochran said "Rubicon catch and release" upon being handcuffed. Pelkey did not know what Cochran meant by this statement.

**{¶ 23}** Officer Richard Ridgeway performed a search of Cochran's vehicle with Detective David Collins and located a duffle bag. Items within the duffle bag were neatly folded.

**{¶ 24}** Tammy Pless, a crisis therapist with Samaritan Behavioral Health at the

Montgomery County Jail, testified that she was called to the jail's booking area to evaluate Cochran on the night of his arrest (May 28). Pless indicated that Cochran reported that he was lost and very confused, but not suicidal. Pless noted that he was depressed, anxious, tearful, and thinking of dying. Cochran denied that he was having hallucinations. Cochran reported to Pless that he had been prescribed Zoloft for depression as a teenager (15 years before). Pless recommended that Cochran be evaluated by a psychiatrist, and he was placed in a special cell for observation.

{¶ 25} Pless saw Cochran again on May 29, and Cochran had expressed feeling better and that he was ready for housing with the general population. Pless cleared him to go into housing. The next day (May 30), Pless was called to Cochran's housing unit, because Cochran had tried to harm himself; Cochran indicated to Pless that he had seen a report about himself and the murder on the news, and that he had run into the wall headfirst to kill himself because he "couldn't spend his life in prison." Pless told the sergeant in the room that Cochran needed to be placed on suicide watch. Immediately afterward, Cochran again ran into the wall.

{¶ 26} After running into the wall, the sergeant grabbed Cochran and restrained him. Other officers were called, and Cochran was placed into a safety restraint chair. Cochran began telling Pless that he was being persecuted by "the Brotherhood." According to Pless, Cochran explained that the Brotherhood were "the Masons, like the [Illuminati] and things like that," and that the Brotherhood were "trying to kill him and he may as well commit suicide because he was as good as dead once they find him." Based on Cochran's statements, he was given antipsychotic medication for paranoia and persecutory delusions. Pless stated that Cochran was suspicious of the medication and

resistant to taking it; Pless led Cochran to be believe that the medication would help him sleep.

**{¶ 27}** Lora Goodin, Cochran's mother, testified that she learned in July 2014 that Cochran had been charged and arrested with a crime, when she received a text from her ex-husband, Keith Garrett, forwarding a letter that Garrett had received from Cochran. The letter read, in part:

Dear Keith Garrett,

This is your stepson, John Cochran. I am in jail for a murder of Mark Gershon. Mark was the man who came to your house late one night claiming to be my father. You scared him away by threatening him with your gun (or so he said). * * *

Please remember the night when a stranger came to your door telling you and Lora that he was my father. The man claimed to be CIA. I need you to talk to my public defender about that tonight. Also, if I was kidnapped at any point during my childhood, this is related to my case. It involves this Mark Gershon guy as well.

I have spent the last month in jail, and the past 12 years living with this man. He confessed to all of these crimes against me. Then on May 28th he kicked me out on the street with no gas money and none of my belongings. I have been going through hell, and I could really use my one favor from you if you want to help.

Sincerely, John M. Cochran.

**{¶ 28}** Goodin testified the events Cochran stated in his letter did not happen. No

one came to the house claiming to be his father, no man came claiming to be with the CIA, and Cochran was never kidnapped. Goodin stated that, after receiving the letter, she spoke to Cochran about its contents. When she told him that the events never happened, Cochran was "in disbelief." He said, "Are you sure?" Goodin testified that Cochran seemed convinced that the events had occurred.

{¶ 29} Both of Cochran's parents testified about his childhood. Goodin testified that Cochran sustained a head injury when he was five years old by "[taking] a head dive right into the floor" while jumping on a bed; the family did not take Cochran to the emergency room. Goodin noticed a change in Cochran's behavior around that age, and when he was 8, Cochran stabbed a boy at school in the hand. The family sought counseling for Cochran.

{¶ 30} Cochran's parents divorced when Cochran was ten, and Cochran and his brother initially lived with their father. Both parents remarried. Cochran later lived with his mother.

{¶ 31} At school, Cochran had behavioral problems and was very defiant. When Cochran was 15, his grandmother passed away, and Cochran became depressed; soon after, his grandfather also died. Cochran was prescribed Zoloft for depression, and he was also hospitalized for psychological evaluation. Cochran saw various counselors and therapists following his release. At home, Cochran "wanted to be a loner," and he would get "very angry" and throw or break something if he did not get his way.

{¶ 32} In high school, Cochran dressed in Goth-style clothing. However, Cochran was deeply affected by the Columbine High School shooting, and stopped wearing some of that clothing. After Cochran was caught shoplifting (age 16), he was send to a boot

camp program, which was supposed to last four or five months. Cochran stayed one week. On his way home, Cochran decided to stop taking Zoloft. Cochran graduated from an alternative high school. He was unable to maintain employment following his graduation. When Cochran was 19, he asked his mother not to vote, because the government would track her and "they're bad people." Cochran told his mother that he was afraid for her life.

{¶ 33} Goodin testified that Cochran joined the Masons in his early 20s. Cochran claimed that he "had to give the leader a blowjob" in order to advance. Cochran lived in several locations and "moved around a lot." Goodin and Cochran had a falling out in August or September of 2008, and the two lost touch.

{¶ 34} Goodin saw Cochran next in June 2010 at Cochran's brother's wedding. Cochran appeared "very agitated, anxious." During the reception, Cochran told Goodin, "Do you know what I wanted to do to you at the rehearsal yesterday? * * * I wanted to slit your throat in front of [brother] so he could watch you die."

{¶ 35} Goodin acknowledged that she never visited Cochran while he resided with Gershon at the house, but she spoke to him occasionally over the telephone. Goodin testified that when she called in early May 2014, Cochran "got real quiet," told her he was walking into another room, and then said in a hushed voice, "Mom, there's something going on. * * * I think I'm being drugged and then raped * * * [by] [m]y roommates and other people." When Goodin asked why he thought this, Cochran reported that he would go in and out of consciousness, wake up with men over him, and "shit out sperm." Goodin told Cochran to leave the house, but Cochran responded that "he couldn't, that they had a tracking device on him and they would hunt him down and kill him."

{¶ 36} Goodin testified that when she saw Cochran in the jail, he was "different." He appeared to be "more even." Goodin learned that Cochran was on medication at the jail.

{¶ 37} Cochran's father, Dartan Cochran ("Dartan"), also testified about Cochran's childhood. Dartan stated that, as an adolescent, Cochran had "pretty extreme mood swings" and he did not know what would "set him off." Dartan did not think Cochran's behavior was due to drugs or anything else that he might have been taking. Dartan stated, "His mood would be so bizarre and it was somebody different. It wasn't my son. I felt estranged from my own son." Dartan stated that "it got bad enough there, there for a while, I had to lock our bedroom door. And to go beyond locking, I set a Coke bottle by the door so if he got past the lock, he wouldn't get past the bottle making noise." Dartan testified that it got so bad that his (second) wife did not want Cochran coming over, and Dartan would take Cochran camping during visitation.

{¶ 38} Dartan testified that Cochran did very poorly and had behavioral problems in school, but did well once he transferred to an alternative school. At home, however, Cochran's would "flip" from one persona to another without warning. Cochran could be aggressive and frightening for hours at a time. Dartan stated that this has happened "ever since he was in high school and it's never stopped."

{¶ 39} On several occasions, Cochran claimed to Dartan that he had been sexually assaulted by someone. Cochran claimed to have been assaulted by a cousin, and later claimed that he was sexually assaulted by a neighbor. More recently, while Cochran was living in Dayton, Cochran told his father that he had been drugged and raped. Dartan tried to convince Cochran to leave, but Cochran said he could handle it.

{¶ 40} Dartan lost contact with Cochran when Cochran moved to Michigan. After several months, they connected briefly on Facebook. Dartan stated that Cochran reappeared on Facebook in 2011, but their instant messaging was "really, really sporadic" and Cochran's emails were "really bizarre." For example, in a messaging exchange on March 28, 2011, Cochran stated to Dartan that Gershon was ex-CIA, that he (Cochran) was a human shield, and that Gershon had said – and Cochran believed – that Cochran's mother carried a "fake pregnancy," that Gershon was his real father, that Cochran was placed in Dartan's family to be raised by humans, that Cochran was a "hybrid alien," and that Cochran had been visited by Gershon throughout his life. Cochran's various Facebook messages in 2011 expressed Cochran's belief that he was in a witness protection program, that he was a pawn of the CIA, and that he was in possession of a "Hell Cube" that reassembled the "Cube of Zion."

{¶ 41} Pat Tannreuther, an investigator with the Montgomery County Public Defender Office, testified that she went to Cochran's residence with defense counsel in June 2014 and collected several items for further review. Among the items was an expandable file folder with bills and other items. One of the documents in the folder was a list of goals; those goals included investing in community bomb shelters, seeking the Knights Templar and the Order of the Veiled Prophet, creating an internet service provider for Master Masons, "gather[ing] enough money for a safety house with bomb shelter and food supplies in case of collapse of the local economy and general society," turning local mine shafts into housing for Freemans and their families, construction of a "local yet hidden system of tunnels connecting the key areas around town * * * if one doesn't already exist," and "[a]chiev[ing] a local town defense capable of preserving our way of life in case

of an absolute worst possible threat." Stapled to the list was what appeared to be a confidentiality agreement, dated April 12, 2007, between Cochran and a Tom McKinney regarding their "business plan." The agreement stated that "[a]ny disclosure of this confidential business plan may cause serious harm to Tom McKinney." Cochran's papers also included the telephone number for the CIA.

{¶ 42} James Swauger, a digital forensic examiner, testified that he examined several electronic devices belonging to Cochran. Of relevance, three of the hard drives on Cochran's computer had data that was encrypted with TrueCrypt, a very secure encryption algorithm, and Swauger could not recover what was on those drives, despite his efforts. Swauger testified that he had seen this level of encryption only twice in his "18 plus years of doing this on a normal user level system."

*The State's Rebuttal Evidence*

{¶ 43} In rebuttal, the State presented the testimony of two psychologists, Dr. Carla Dreyer and Dr. Kara Marciani, and an EMT at the Montgomery County Jail, Chad Rowland.

{¶ 44} Rowland testified that he screens inmates at the jail as part of the booking process, and that he screened Cochran on May 28, 2014. Rowland had referred Cochran for mental health services, because Cochran answered "yes" to a question during the mental health screening.

{¶ 45} Dr. Dreyer, Clinical Director at Court Clinic Forensic Services, was called to testify by the State in rebuttal, but some of her testimony was helpful to Cochran. Dr. Dreyer testified that she interviewed Cochran for two hours on August 26, 2015, and reviewed an expert report previously prepared by Dr. Marciani, as well as school records,

correspondence between Cochran and family members, jail records from 2014, police interview notes, and additional information received from the State, defense counsel, Cochran's family, Bennett, and others.

{¶ 46} In Dr. Dreyer's opinion, Cochran had a severe mental disease (psychosis) at the time of the offense, and she acknowledged that Cochran had indicated that he was obligated to kill Gershon as part of some project involving the CIA. Cochran had also told Dr. Dreyer that, after the murder, he called the CIA in Northern Virginia and stated, "Rubicon, this is John Michael Cochran reporting a mission completed. Target is dead." Dr. Dreyer further testified that "there was also significant information predating the offenses charged [that] indicated that he had a long-standing history of delusional thinking, typically, revolving around police [sic] about the CIA, paranoia, Masons, conspiracy theories, and so forth, but that he also had this * * * difficulty with maintaining healthy personal, interpersonal relationships." At one point, Dr. Dreyer testified that Cochran's significant encryption of his computer was an indicator of paranoia.

{¶ 47} However, Dr. Dreyer further testified that Cochran did not meet the standard for not guilty by reason of insanity. Dr. Dreyer opined that, despite his psychosis, Cochran had understood the wrongfulness of his actions. Dr. Dreyer testified that, when she asked Cochran why he had killed Gershon, he responded that he was angry with learning that Gershon planned to "make him leave the home" and that Gershon was going to "replace" him with Calina, who planned to move back in. She explained her opinion that Gerson understood the wrongfulness of his conduct, saying:

And I based that primarily on the fact that this -- even though he talked about the CIA, and so forth, he also indicated that this was a crime

or [an] incident that arose out of significant anger. And he also indicated to me that he knew that what he did was wrong. He knew that when he hit Mr. Gershon initially in the car, that he was going to get into trouble. And he got angry when he -- Mr. Gershon tried to call police. So he tried to stop Mr. Gershon from calling police, which would be behavior that would further indicate that he knew it was wrong. He tries to continue to then silence Mr. Gershon and, at some point, leaves, which would suggest that he was trying to avoid being taken into custody. But then he realizes he needs to turn himself in, because he knows he's in trouble. So the whole time, everything he said to me indicated that he understood that what he did was wrong. I do believe that what he did was impulsive. And I don't think he necessarily planned it out. But in the state of Ohio, the criteria is if the mental illness prevented them from knowing the wrongfulness of the behavior. And so, I opined that he did not meet the criteria.

{¶ 48} Dr. Marciani, Director of the Forensic Psychiatry Center for Western Ohio, also testified that she evaluated Cochran as to his plea of not guilty by reason of insanity. Her initial meeting with Cochran occurred on January 15, 2015, and lasted for three hours. A tester with her office administered the MMPI-2 test at the jail on January 19, and Dr. Marciani returned to the jail on January 31 to administer the SERS-2 test. Dr. Marciani obtained information from a variety of sources, including school records, interviews with family members and roommates, police reports, cruiser video recordings, autopsy photos, and information from defense counsel, such as text messages.

{¶ 49} After conducting her psychological evaluation, Dr. Marciani was of the

opinion that Cochran was not suffering from either a mental disease or a mental defect at the time of the offenses and that he understood the wrongfulness of his acts.  Dr. Marciani explained why she did not believe Cochran suffered from a mental disease or defect, stating:

> * * * While he is an unusual individual, interpersonally, he is weird[,] [a]nd he does have some unusual habits and what-have-you[,] I think his behavior is better explained by personality disorders; specifically, borderline personality disorder and antisocial personality disorder.  The former diagnosis is a diagnosis that's assigned to individuals who have a longstanding history of unstable interpersonal relationships.  These individuals have marked fears of abandonment.  They will go to great lengths to try to avoid either real or perceived abandonment.  They also have a significantly unstable sense of self, and they have unstable mood.
>
> You know, I think some of what he is calling depression in my opinion is occurring secondary to this borderline personality disorder.  Okay. Similar individuals can be erratic, they also have histories of suicidal ideation with suicide attempts, and typically such behavior is an association with some sort of family discord or discord in their interpersonal relationships.
>
> Some individuals also at times can exhibit transient stress-related paranoid ideation.  So they can look paranoid, but they're not truly psychotic.  So that's the borderline personality disorder.  It's my opinion that his depression and his suicidal stuff and any -- not any, but some of

that paranoid looking presentation occurs secondary to that.

I also think he meets the diagnostic criteria for antisocial personality disorder. We've talked about that a little bit, but, again, that's the diagnosis that's assigned to individuals who exhibit a persistent pattern of disregard for social norms with regard to lawful behavior. They are aggressive. They are irresponsible. They are irritable. They also lack remorse for their unlawful or, you know, threatening or bad behavior. So that's what I think is sort of going on with him.

Now, those two personality disorders are not psychiatric illnesses. Those tend to occur -- there is some sort of genetic biological component, but those behaviors, behaviors that result from that, also tend to be learned. They also tend to come out of an individual's early experience. So in terms of kind of the borderline stuff, it's very clear that his parents' divorce was problematic for him. It continues to be problematic to this day, and he's an adult. * * *

The other thing to note in terms of whether or not he suffers from a severe mental illness is that you can't ignore the fact that his substance use way predates the onset of any psychotic stuff. You know, pot can make you paranoid. He's used hallucinogens. And so that has to be taken into account because that I think that any unusual behavior he's exhibited over time either was as a result of his unstable sense of self, his fear of abandonment, etc., or it occurred secondary or was influenced by his substance use.

## III. Sufficiency and Manifest Weight Analysis

{¶ 50} Construing the evidence in the light most favorable to the State, the State presented sufficient evidence to support Cochran's conviction. Cochran resided with Gershon for several years, and Gershon had supported Cochran financially, providing food, shelter, utilities, and other amenities. At the time of the murder, Cochran had just assaulted Gershon, and Gershon was in the process of contacting the police about Cochran's behavior. Cochran was aware that Gershon wanted Cochran to be removed from the home and that Gershon's former boyfriend, Calina, was scheduled to move back into the residence in the near future. The jury also heard evidence that Cochran had issues controlling his anger, and that he was fearful and angry about Gershon's plans to kick him out of the house. Construing the evidence in the State's favor, the jury could have reasonably concluded that Cochran intentionally and purposefully killed Gershon due to Gershon's plans to evict him.

{¶ 51} To the extent that Cochran asserts that the State's evidence is insufficient in light of his not guilty by reason of insanity defense, we question whether he can raise the merits of his NGRI defense in the context of a legal-sufficiency challenge. "The defendant's sanity is not an element" of a criminal offense. *State v. Hancock*, 108 Ohio St.3d 57, 2006-Ohio-160, 840 N.E.2d 1032, ¶ 35. Therefore, the State need not prove "that the defendant was sane. To the contrary, insanity is an affirmative defense." *Id.* The due process-based "sufficient evidence" standard does not implicate affirmative defenses. *Id.* at ¶ 37. Rather, the evidentiary support for Cochran's NGRI defense is more properly analyzed in the context of the manifest weight standard.

{¶ 52} Cochran claims that the jury "lost its way" in convicting him, because there

was "an overwhelming amount of testimony presented regard[ing] the Defendant's mental illness." We agree with Cochran that there was substantial evidence from which a jury could have concluded that Cochran chronically, if not continuously, suffered from a mental illness. Testimony from Cochran's parents, Bennett, jail personnel, and Dr. Dreyer supported a conclusion that Cochran suffered from paranoia and numerous delusions, including (among others) that he had been abducted as a child, that he was a CIA operative, that he was in a witness protection program, and that Gershon was an ex-CIA agent. The existence of the mental illness was further supported by printouts of Cochran's messages with his family members, the documents found in his room, the security measures in his bedroom, and the high level of encryption on his computer. Cochran's phone call to the CIA immediately after the murder, in addition to his saying "Rubicon catch and release" upon being handcuffed, supported Cochran's position that he was suffering from a mental illness at the time of the offense. Dr. Dreyer provided expert testimony that Cochran suffered from a form of psychosis.

{¶ 53} However, in order to establish that he was not guilty by reason of insanity, Cochran was further required to establish that he did not, as a result of the mental illness, understand the wrongfulness of his conduct. We note that Cochran cites to *State v. Staten*, 18 Ohio St.2d 13, 247 N.E.2d 293 (1969), in which the Ohio Supreme Court held that, "[i]n order to establish the defense of insanity, the accused must establish by a preponderance of the evidence that disease or other defect of his mind had so impaired his reason that, at the time of the criminal act with which he is charged, *either* he did not know that such act was wrong *or he did not have the ability to refrain from doing that act.*" (Footnotes omitted.) *Id.* at 21. That holding no longer establishes the standard for an

insanity defense; the ability to refrain from doing the act is no longer part of the definition of "not guilty by reason of insanity." *See* R.C. 2901.01(A)(14). Although there was some evidence from which the jury might have concluded that Cochran could not control his actions due to his anger and his delusions of being a CIA operative and having a mission to kill Gershon, such a conclusion, even if reached by the jury, would not have been relevant to his NGRI defense.

{¶ 54} There was some evidence from which the jury could have concluded that, as a result of Cochran's mental illness, he did not understand the wrongfulness of his conduct at the time of the offenses. Cochran reported to Dr. Dreyer that he had attempted to report his "completed mission" to the CIA after the murder. And upon returning the house, he told the arresting officer, "Rubicon catch and release," which perhaps was intended to signal to the police officer that he (Cochran) should be quickly released due to his association with the CIA. From this evidence, the jury could have concluded that Cochran believed his actions to be justified by his "mission." In addition, those statements could have indicated that, while Cochran understood that he would need to be detained by authorities in the short-term, he did not believe his actions were wrong and he believed that he would be released as a CIA operative shortly thereafter.

{¶ 55} Nevertheless, upon review of the entire record, we cannot find that there was "overwhelming evidence" that Cochran failed to appreciate the wrongfulness of his actions. Dr. Dreyer, while recognizing the existence of his mental illness, opined that Cochran's conduct before, during, and after the murder indicated an understanding that his actions were wrong. After assaulting Gershon in the car and shortly before stabbing Gershon, Cochran had asked Bennett if Gershon were going to call the police. During

the stabbing, when Bennett attempted to intercede, Cochran terminated the 911 call from Gershon's phone. Cochran left the house immediately after the stabbing, and in his interview with Dr. Dreyer, Cochran had expressed his understanding that he needed to turn himself in. No expert testified that, at the time of the offenses, Cochran failed to appreciate the wrongfulness of his conduct due to a mental illness.

{¶ 56} In reaching its verdict, the jury was free to believe all, part, or none of the testimony of each witness and to draw reasonable inferences from the evidence presented. *State v. Baker*, 2d Dist. Montgomery No. 25828, 2014-Ohio-3163, ¶ 28. It was the province of the jury to weigh the evidence and determine whether Cochran had proven, by a preponderance of the evidence, his NGRI affirmative defense. Based on the totality of the evidence, we cannot conclude that the jury lost its way in finding that the affirmative defense was not established. Cochran's conviction was not against the manifest weight of the evidence.

{¶ 57} Cochran's assignment of error is overruled.

**IV. Conclusion**

{¶ 58} The trial court's judgment will be affirmed.

. . . . . . . . . . . . .

HALL, J. and WELBAUM, J., concur.

Copies mailed to:

Meagan D. Woodall
Kirsten Knight
Hon. Michael L. Tucker