[Cite as *State v. Duran*, 2025-Ohio-2165.]

To IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | C.A. No. 2024-CA-41 |
| Appellee | : | |
| | : | Trial Court Case No. 2022CR0386 |
| v. | : | |
| | : | (Criminal Appeal from Common Pleas |
| REID C. DURAN | : | Court) |
| | : | |
| Appellant | : | **FINAL JUDGMENT ENTRY &** |
| | : | **OPINION** |

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on June 20, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

[[Applied Signature]]

CHRISTOPHER B. EPLEY, PRESIDING JUDGE

[[Applied Signature 2]]

MARY K. HUFFMAN, JUDGE

[[Applied Signature 3]]

ROBERT G. HANSEMAN, JUDGE

**OPINION**
GREENE C.A. No. 2024-CA-41


ROBERT ALAN BRENNER, Attorney for Appellant
MEGAN A. HAMMOND, Attorney for Appellee


EPLEY, P.J.

{¶ 1} Defendant-Appellant Reid C. Duran appeals from a judgment of the Greene County Court of Common Pleas, which found him not guilty of attempted kidnapping by reason of insanity and found him guilty of felonious assault and escape. The court sentenced Duran to time in a mental health facility for the attempted kidnapping and to prison for the felonious assault and escape. For the reasons that follow, the judgment of the trial court is affirmed.

## I. Facts and Procedural History

{¶ 2} In the late afternoon/early evening of August 22, 2022, Duran left his job at Lowe's and drove to St. Brigid School in Xenia to attend a back-to-school open house and ice cream social. He had no children and knew no one at the school.

{¶ 3} Upon arrival, Duran entered the school lobby carrying a plastic bag of clothes and asked Terry Adkins, the school's principal, if he could use the restroom. Adkins did not recognize Duran but permitted him to go to the boys' restroom; Adkins remained outside the restroom to make sure no one came in or out while Duran was in there. A surveillance video showed that Duran entered wearing an orange shirt, black pants, and a blue Lowe's hat but exited the restroom a few minutes later having changed his clothes – wearing a blue shirt (turned inside out) and black shorts with the same Lowe's hat.

{¶ 4} After Duran emerged from the restroom, Adkins introduced himself and asked Duran who he was. Duran identified himself as "J.J.'s father." The principal then asked where

"J.J." and the rest of his family was. "Oh, they're coming. They're late" was his reply. Adkins testified that it was not necessarily unexpected to not recognize a parent, especially a father, because, as he explained, "a lot of times I never meet the father until school starts; or until another event. So, it was not unusual[.]" Trial Tr. at 33. Neither was it necessarily suspicious that Duran claimed his family was late because, according to Adkins, "a lot of families are split up, and . . . come in at different times." Trial Tr. at 34.

{¶ 5} While Adkins found Duran's mannerisms a little odd, he initially did not think there was anything criminal about the behavior. However, the longer Duran stayed without his family's arrival, the more suspicious the principal became. The school's security video showed Duran milling around in the hallway, seemingly unsure of where to go or what to do. After several minutes, Duran walked down the corridor towards the kindergarten room.

{¶ 6} Adkins kept an eye on Duran while Adkins interacted with other families and noticed that Duran had moved down the hallway. Adkins followed Duran, and when he got to the kindergarten room, he found Duran sitting at a table that had the students' name plates on it. At every seat, there were papers to go home with information about drop off and pick up, forms to fill out, and a little bag of candy. Duran was sitting at a child's spot ("Jane Doe," for privacy purposes) and was talking with the teacher. Adkins overheard them talking about school supplies and noted that Duran asked if he could buy supplies there.

{¶ 7} Adkins testified that, while he was still leery, the name Duran had given for his child – "J.J." – was a plausible nickname for Jane Doe, so he went about his business in the lobby greeting families. Fifteen minutes later, Adkins went back to the kindergarten classroom and found Duran still in the room, off to the side, "just kind of standing there watching things." Trial Tr. at 37.

{¶ 8} Adkins was not the only person in the building to become suspicious of Duran.

Trevor King, whose stepdaughter attended St. Brigid and who was at the open house that night, testified that he noticed Duran almost immediately. King told the jury that, as he and his family were waiting to enter his daughter's classroom (the kindergarten room), they saw a picture of a tree with each student's face on it hanging on the wall outside the room. "We were looking for my daughter [on the tree]. And as we were looking, [Duran was] also looking at the tree. And at the tree, he starts to caress a picture of Jane Doe. And that's kind of like where I knew something was up." Trial Tr. at 110. He said that, once they were inside the kindergarten room, Duran was just "looking around, trying to get a layout of the classroom." However, King never saw Duran talk to any children.

{¶ 9} Eventually, Adkins re-engaged with Duran. "I asked him again, 'remind me who's your family?' And that's when he said, 'yeah, I'm Jane Doe's father.' " Trial Tr. at 39. After Adkins asked where Jane was, Duran told Adkins that the rest of his family was late.

{¶ 10} Fully suspicious at that point, Adkins returned to his post in the lobby but kept watch on the kindergarten room. Soon, the principal met Jane Doe and her family. "I said I didn't want to alarm them, but I said, 'do you have other family members? Are you expecting to meet anybody else here? Is there a stepfather . . . or somebody else in your family?' " Trial Tr. at 41-42. When they said no, he told them there was someone claiming to be Jane Doe's father and that he needed to find that person immediately.

{¶ 11} After a few minutes of looking, Adkins found Duran outside at the ice cream social. This time he confronted Duran to find out who he really was. "I said, 'who are you?' and he said, 'I'm Jane Doe's father.' And I said, 'no you're not. I know her father and that's not you.' " Trial Tr at 43. Duran apologized and admitted that Jane Doe was not his daughter but then changed his story to say he was actually looking for his daughter, "J.J." Because Adkins believed that Duran had no legitimate reason to be at St. Brigid, Adkins called 911

and made sure Duran did not leave before law enforcement arrived.

{¶ 12} Xenia police officer Nicolas Peters was the first on scene to make contact with Duran; the men's interaction was recorded on Officer Peters's body camera. Initially, Duran told Officer Peters that he was experiencing psychological problems, specifically paranoia, and that he was trying to get to Greene Memorial Hospital. As Officer Peters learned more about the situation and pressed Duran further, Duran told him that he came to the school and made up a child's name so he could "feel part of the group." After further investigation showed that he had picked up Jane Doe's paperwork from her classroom, Duran's story changed again. He hypothesized that one day he might be a dad, so he wanted to see how to interact with children. Finally, he told Officer Peters that he was "trying to be friendly with a kid" and admitted that he was not really trying to get to the hospital, but his intention all along was to come to the school.

{¶ 13} Officer Jared Cecil was also dispatched to St. Brigid that night and his body camera video was introduced as evidence at trial. He testified that when he asked Duran why he was at the school, Duran told him he was "here for the kids." Trial Tr. at 233; Exh. 3.2 at 16:40. The video also recorded Duran telling Officer Cecil that he had searched the internet to learn about the open house and he had come specifically to look for children because he was attracted to them. Trial Tr. at 238. He explained to Officer Cecil that he came into the building and made up a story that he had a child at the school named Jane Doe. According to both Officer Cecil's testimony and his body camera video, Duran planned to take a child home with him and touch her inappropriately. Trial Tr. at 239-240. He stated he wanted to do it because "[i]t's a sexual desire I have." Trial Tr. at 241; Exh. 3.2 at 27:40.

{¶ 14} At some point, the conversation with the officers turned to Duran's alleged abuse of illegal drugs, and he told the officers that he used cocaine and "downers." When

asked if he had drugs in his car, Duran stated that he did and gave permission to search the car. No drugs were found. He could offer no explanation as to why he had lied about the drugs.

{¶ 15} After the search of his car, Duran voluntarily accompanied Xenia officers to the police station for an interview. Once there, he was placed in an unlocked interview room to wait for Detective Chris Reed. The security video depicted Duran, who was not restrained in any way, sitting in the sparse room in a chair in front of a table. Officer Peters was seated in a chair behind Duran in the back corner of the room. The video showed Duran rocking back and forth and side-to-side on the swiveling chair, every so often glancing at a pen situated on the left-hand side of the table. Duran then reached for the pen with his left hand, spun around, and lunged at Officer Peters's throat. Exh. 2.3 at 8:09.11. Officer Peters blocked the attack with his arm, took Duran to the ground, and subdued him until other officers arrived. Duran was then restrained with handcuffs.

{¶ 16} Not long after the attack on Officer Peters, Duran was interviewed by Detective Reed. Exh. 2.3. During the interview, Duran revealed that he chose Jane Doe because he liked her name, and when he saw her picture on the wall, he was attracted to her. Trial Tr. at 334. When asked what his intentions were with the girl, Duran revealed that he wanted to take her back to his apartment and "do things you would normally do with adults." Trial Tr. at 334. Duran admitted that had intended to perform oral sex on her and have intercourse.

{¶ 17} During the interview, Duran revealed how he had planned to get Jane Doe to leave with him. His plan was to give her candy laced with drugs. He told Detective Reed that, after he had finished with her, he would have kept her captive and done things so she could not cry out. He also claimed that he had engaged in this type of behavior before and that there was – at that very moment – a child named Rudy in his apartment. Duran later

rescinded that comment.

{¶ 18} At the conclusion of the interview, Detective Reed stepped out of the room for a moment, and Officer Cecil took his place to supervise Duran. Officer Cecil testified that shortly after he entered the interview room, and while Duran was still handcuffed and seated in a chair, "[Duran] began looking around the room. And then, he leapt up from his chair; or jumped to his feet. And, with his hands behind his back, tried to open the door that I had entered the room through." Trial Tr. at 248; Exhs. 2.3 and 3.2. Officer Cecil tackled Duran to the floor to secure him and then escorted him to jail.

{¶ 19} Duran was then transported back to the Xenia police headquarters for fingerprinting. Officer Benton Smith and another officer walked him to the basement where the booking area is located. Smith had Duran sit on a bench nearby. While they were waiting, Officer Smith noticed Duran sit forward on the edge of the bench and look around the room. Duran then jumped up and ran toward the door. He got through it, but it led to another secure room. Officers calmly brought him back to the booking room and the bench on which he had previously been seated. Exh. 5.1.

{¶ 20} After his second escape attempt, Duran was interviewed again by Detective Reed. Exh. 4.1 and 4.2. Duran was open about trying to stab Officer Peters and his escape attempts. When asked about the incident with the pen, Duran responded that he did it because he felt cornered. Trial Tr. at 364. His goal was "to put [Peters] down" and get away from detention. Trial Tr. at 365. His intention with the handcuffed dash for the door was to get away.

{¶ 21} On August 31, 2022, Duran was indicted on one count of attempted kidnapping, a felony of the second degree; one count of felonious assault of a peace officer, a felony of the first degree; and one count of escape, a felony of the second degree. The

attempted kidnapping charge had two specifications attached: (1) the offense was committed with a sexual motivation, and (2) it was committed in a school safety zone.

{¶ 22} The next day, Duran filed motions for competency and not guilty by reason of insanity ("NGRI") evaluations. Duran was evaluated by Dr. Massimo De Marchis, who concluded that he was competent to stand trial; both parties stipulated to the report, and the trial court found him competent. On April 4, 2023, Duran asked the trial court for an independent forensic examination to determine his mental state at the time of the incidents. The motion was granted, and Duran was evaluated by Dr. Richard Bromberg. On February 23, 2024, just before the start of trial, Duran entered a NGRI plea.

{¶ 23} The case proceeded to a jury trial on February 26, 2024. During the week-long trial, the jury heard from many witnesses for the State, including Principal Adkins, Trevor King, who saw Duran in the kindergarten classroom, Jane Doe's father, Xenia officers Peters, Cecil, and Smith, Detective Reed, and Erin Hartpence, a corrections officer at the Greene County Jail. Duran presented several witnesses of his own: his mother, Melissa King, coworkers Mark Perry and Karen Brennaman, and his expert, Dr. Bromberg.

{¶ 24} The experts gave differing opinions about Duran. Dr. Bromberg opined that Duran had suffered from a severe mental disease or defect when he committed the crimes and, as a result, did not know the wrongfulness of his actions, thus meeting the definition of NGRI. The State presented two rebuttal witnesses: Dr. De Marchis and Dr. Kara Marciani. They reached the opposite conclusion. While they both believed that Duran had been suffering from a severe mental disease at the time of the offenses, they thought he knew the wrongfulness of the acts; therefore, he did not meet the requirements for NGRI.

{¶ 25} Ultimately, the jury found Duran not guilty by reason of insanity as to the attempted kidnapping charge, but guilty of felonious assault and escape. The trial court

found him to be a person with a mental illness subject to court order pursuant to R.C. 2945.40 and ordered that he be committed to Twin Valley Behavioral Health on the attempted kidnapping. Duran was then sentenced to an aggregate 8-12 years in prison for felonious assault and escape, to be served once he was released from Twin Valley. He was credited with 660 days of jail-time credit.

**{¶ 26}** On January 8, 2025, Duran was found to no longer be a person with a mental illness subject to court order under R.C. 2945.40; he was released from Twin Valley and remanded to the Ohio Department of Rehabilitation and Correction to serve his prison sentence.

**{¶ 27}** Duran appeals.

**II.      Manifest Weight**

**{¶ 28}** While Duran couches his first assignment of error as a manifest weight of the evidence argument, he really makes two separate claims. He argues, first, that he actually did not commit the crime of attempted kidnapping, and second, that he was insane when he attacked Officer Peters and when he tried to escape.

Attempted Kidnapping

**{¶ 29}** Duran first argues that he was not attempting to kidnap Jane Doe, rather he was simply "a mentally ill person trying to fit in a social event." Appellant's Brief at 8. As a result, he claims his NGRI finding should be reversed as against the manifest weight of the evidence. We disagree.

**{¶ 30}** A defendant bears the burden of establishing affirmative defenses, including the defense of not guilty by reason of insanity. R.C. 2901.05(A). *See State v. Tibbetts,* 92 Ohio St .3d 146, 164-165 (2001); *State v. Cochran*, 2017-Ohio-216, ¶ 7 (2d Dist.). Because NGRI is an affirmative defense, though, it functions to excuse *admitted conduct* that is

otherwise illicit. "[A]n affirmative defense . . . is in the nature of a 'confession and avoidance,' in which the defendant admits the elements of the crime, but seeks to prove some additional fact that negates culpability." *State v. Bennett*, 2019-Ohio-2996, ¶ 26 (2d Dist.). *See also State v. Poole*, 33 Ohio St.2d 18, 19 (1973).

{¶ 31} Because Duran entered the NGRI plea, he necessarily admitted committing the crime of attempted kidnapping. It does not reason that he could now disavow the admission and argue on appeal that he really did not commit the offense. *See State v. Morefield*, 2015-Ohio-448, ¶ 30 (2d Dist.) (a defendant in a criminal case must admit the commission of the act constituting the criminal offense before affirmative defenses may be submitted to the jury).

Felonious Assault and Escape

{¶ 32} In the second part of his first assignment of error, Duran asserts that his convictions for felonious assault and escape were against the manifest weight of the evidence because he was legally insane at the time of those offenses.

{¶ 33} An insanity defense requires proof that, "at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." R.C. 2901.01(A)(14). The evidentiary support for a NGRI defense should be analyzed in the context of a manifest weight standard. *State v. Cochran*, 2017-Ohio-216, ¶ 51 (2d Dist.).

{¶ 34} When an appellate court reviews whether a conviction is against the manifest weight of the evidence, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v.*

*Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A case should not be reversed as being against the manifest weight of the evidence except " 'in the exceptional case in which the evidence weighs *heavily* against the conviction.' " (Emphasis added.) *Id.* "The weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of the facts." *State v. Thomas*, 70 Ohio St.2d 79 (1982).

{¶ 35} At trial, the jury heard testimony from three expert witnesses; Dr. Bromberg testified on behalf of Duran. Dr. Bromberg explained that he spent several hours with Duran about nine months after the incidents. He considered hospital and police records, reviewed past medical evaluations, interviewed Duran's mother, and performed multiple tests on Duran, including the Minnesota Multiphasic Personality Inventory and the Personality Assessment Inventory. (The MMPI and PAI are tests that assess the respondent's personality and psychopathy.) According to Dr. Bromberg, Duran was suffering from schizoaffective bipolar disorder (described as "a thought disorder and a mood disorder together"); paranoid personality disorder; generalized anxiety disorder; and substance abuse disorder (though it was unclear what substance was being abused). Dr. Bromberg also administered the Roger's Criminal Responsibility Scale (R-CRAS), a controversial test used by some to determine whether a person is criminally insane.

{¶ 36} Based on this information and testing, Dr. Bromberg determined that Duran had suffered from a severe mental illness on August 22, 2022, and that "he was not sane at the time of the alleged events." Trial Tr. at 526. It was Dr. Bromberg's overall conclusion that Duran was "legally insane" at the time of his conduct, Trial Tr. at 536-537, and did not know the wrongfulness of his actions. Trial Tr. at 581-583.

{¶ 37} On cross-examination, the State challenged Dr. Bromberg's findings on several points, especially as to the tests used. He acknowledged that the MMPI and PAI tests do not demonstrate what Duran's mental state was on August 22, 2022, but rather how Duran thought at the time of the interview, nine months after the crimes. "It is a snapshot of . . . they are essentially describing themselves at the time." Trial Tr. at 552-553. The validity of the R-CRAS test was also called into question, and Dr. Bromberg admitted that it was not based on Ohio's NGRI standard.

{¶ 38} In rebuttal, the State presented two experts who strongly disagreed with Dr. Bromberg's analysis. First, Dr. De Marchis took the stand. In addition to reviewing police and hospital records and witness statements, Dr. De Marchis had personally evaluated Duran in October 2022, meeting face-to-face for approximately two hours. Although Dr. De Marchis believed that Duran had suffered from a severe mental disease at the time of the crimes (he had formal diagnoses of schizophrenia, paranoid personality disorder, etc.), it was Dr. De Marchis's opinion that Duran knew the wrongfulness of his actions. This opinion was at least partially based on the inconsistent stories Duran told during his interactions with officers and Dr. De Marchis.

{¶ 39} The doctor told the jury that Duran had told him he was going to Jamestown (not Greene Memorial Hospital) to get treatment on August 22 and that he went to St. Brigid by chance, rather than after he checked online for an open house like he told officers. Dr. De Marchis recounted that Duran told him that he was paranoid and thought people were after him, but his behavior – going to an open house in a school full of people – did not make sense if he was truly paranoid. A place full of people was the last place Duran would have wanted to be if he were paranoid. Trial Tr. at 647. Dr. De Marchis also pointed out that, on at least one occasion, Duran had apologized to officers – another sign of knowledge of

wrongfulness. Dr. De Marchis believed that Duran's escape attempts showed he understood what he did was wrong. "If you did nothing wrong, you wouldn't try to escape." Trial Tr. at 694.

{¶ 40} Finally, Dr. De Marchis did not believe that, at the time of the crimes, Duran had shown active signs of mental illness. According to Dr. De Marchis, if Duran had actually been ill, he "would've presented in a disorganized fashion. He would have made delusional, paranoid statements. He would have acted erratically." Trial Tr. at 645. Duran exhibited none of that. "My conclusion was that his actions were purposeful, bland, and goal directed; and as a result of such, he knew the wrongfulness of his actions." Trial Tr. at 644.

{¶ 41} The State's other rebuttal expert, Dr. Kara Marciani, did not believe Duran met the NGRI requirements either. She highlighted several steps that Duran had taken which indicated he knew the wrongfulness of his actions. First, Duran went into the school and immediately changed clothes to blend in. Dr. Marciani believed he did that because he knew he was not supposed to be there. She also stated that he had created a plausible excuse to be there by making up the fact that he had a child named "J.J." at the school. And when he was confronted, he acted scared because he knew he was in trouble. Like Dr. De Marchis, she noted that Duran had apologized, and she opined that people do not apologize unless they know they have done wrong. Dr. Marciani concluded: "I think he had a plan when he went to that school." Trial Tr. at 748.

{¶ 42} As to Duran's actions at the Xenia police station, Dr. Marciani told the jury that Duran had admitted to debating about whether to stab Officer Peters, and that debate was based on the understanding that he would get in more trouble – a clear indication of knowing wrongfulness. In fact, she believed that Duran had planned the attack because he told her that he "figured he could use the pen to stab the officer, and in doing so, slow the officer

down. Like, that would give him time to get out of there[.]" Trial Tr. at 730. She reported that Duran told her he knew he would get in trouble for it but nevertheless thought it was worth it.

{¶ 43} When asked about his escape attempt(s), Duran told Dr. Marciani that he was trying to elicit behavior that would achieve his goal of being killed by an officer. According to Dr. Marciani, he *purposefully* did something he knew would warrant a forceful response.

{¶ 44} Dr. Marciani also called into question the evaluation done by Dr. Bromberg, specifically attacking the efficacy of the tests he had performed. For instance, the MMPI and PAI tests carried little weight because those tests only indicate the personality and perhaps the mental state of the person at the time of the test. "[T]he question was about his mental state in the past[.] We don't have a test that tells us about somebody's mental state in the past. So, then [they weren't] relevant tests to give him to answer that question." Trial Tr. at 724. Dr. Marciani was even more critical of the R-CRAS test. She testified that not only is it not accepted by the psychological community, but the manual for the test itself says it is for research purposes only and should not be used to inform a court. More importantly, she opined that the R-CRAS test was not designed to fit Ohio's NGRI standard. Dr. De Marchis had a similar view. He told the jury that the R-CRAS test was not a scientific instrument because it was subjective, and he stated, "I almost never saw that test applied to a forensic sanity, at the time of the offense, evaluation." Trial Tr. at 643.

{¶ 45} "The weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of the facts." *Thomas*, 70 Ohio St.2d 79. Consequently, if there is competing evidence of a defendant's ability to ascertain the wrongfulness of the act(s), and "the record demonstrates that the jury considered the insanity defense, a reviewing court should defer

to the jury's interpretation of the evidence." *State v. Self*, 2005-Ohio-1259, ¶ 13 (4th Dist.). *See also State v. Schmid,* 2025-Ohio-14, ¶ 30 (2d Dist.); *State v. Mitchell,* 2016-Ohio-7691, ¶ 19 (2d Dist.) (concluding that the jury did not lose its way when it credited one expert's testimony over another); *State v. Doseck*, 1995 WL 324645 (2d Dist. April 26, 1995) ("A trial court's judgment as to insanity, will only be reversed where overwhelming and uncontradicted evidence leads to a contrary conclusion.").

**{¶ 46}** The jury was in the best position to determine whether Duran was sane at the time he tried to stab Officer Peters and then escape from the interview room, because it saw his interactions with officers and then his interview with Detective Reed; the videos allowed the jury to view his speech, mannerisms, and the way he responded to questions. That, combined with the testimony from the doctors, make it clear the jury did not lose its way when it concluded that Duran was not NGRI as to felonious assault and escape. The jurors were free to credit the testimony of Drs. De Marchis and Marciani over Dr. Bromberg, and they evidently did.

**{¶ 47}** Duran's first assignment of error is overruled.

### III.  Prison Sentence

**{¶ 48}** In his second assignment of error, Duran asserts that his prison term of 8 to 12 years for felonious assault and escape was excessive.

**{¶ 49}** A trial court has full discretion to impose any sentence within the authorized statutory range, and it is not required to make any findings or give its reasons for imposing a maximum or more than minimum sentence. *State v. Jones*, 2021-Ohio-325, ¶ 85 (2d Dist.). "However, a trial court must consider the statutory criteria that apply to every felony offense, including those set out in R.C. 2929.11 and R.C. 2929.12." *Id.*

**{¶ 50}** When reviewing felony sentences, we must apply the standard of review set

forth in R.C. 2953.08(G). Under that statute, an appellate court may increase, reduce, or modify a sentence, or vacate it altogether and remand for resentencing, if it "clearly and convincingly finds either (1) the record does not support certain specified findings or (2) that the sentence imposed is contrary to law." *State v. Worthen*, 2021-Ohio-2788, ¶ 13 (2d Dist.).

**{¶ 51}** According to the Ohio Supreme Court, we may not independently "weigh the evidence in the record and substitute [our] judgment for that of the trial court concerning the sentence that best reflects compliance with R.C. 2929.11 and 2929.12." *State v. Jones*, 2020-Ohio-6729, ¶ 42. The inquiry is simply whether the sentence is contrary to law. A sentence is contrary to law when it falls outside the statutory range for the offense or if the sentencing court does not consider R.C. 2929.11 and 2929.12. *State v. Dorsey*, 2021-Ohio-76, ¶ 18 (2d Dist.).

**{¶ 52}** Duran's concurrent 8-to-12-year sentences for felonious assault and escape were within the statutory range for first or second-degree felonies. During the sentencing hearing and in the judgment entry, the court noted that it had considered the record, oral statements from counsel and Duran, the presentence investigation report, victim impact statements, the sentencing memoranda from both sides, and then considered the principles and purposes of sentencing under R.C. 2929.11 and the seriousness and recidivism factors of R.C. 2929.12 in crafting its sentence. Thus, Duran's sentence is not contrary to law.

**{¶ 53}** To the extent that Duran argues his sentence was unsupported by the record, that argument is foreclosed by *Jones,* 2020-Ohio-6729. Even if it were not, we would find there was evidence in the record to support it. The assignment of error is overruled.

**IV.  Conclusion**

**{¶ 54}** The judgment of the trial court is affirmed.

. . . . . . . . . . . .

HUFFMAN, J. and HANSEMAN, J., concur.