[Cite as *State v. Chambers*, 2019-Ohio-4819.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                                         Court of Appeals No. L-18-1188

     Appellee                                   Trial Court No. CR0201801123

v.

Ronald Chambers                              **DECISION AND JUDGMENT**

     Appellant                                   Decided: November 22, 2019

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Lauren Carpenter, Assistant Prosecuting Attorney, for appellee.

Laurel A. Kendall, for appellant.

* * * * *

**MAYLE, P.J.**

{¶ 1} Appellant, Ronald Chambers, appeals the August 17, 2018 judgment of the

Lucas County Court of Common Pleas sentencing him to 8 years in prison. For the

following reasons, we affirm.

## I. Background and Facts

**{¶ 2}** In January 2018, Chambers was indicted on one count of felonious assault in violation of R.C. 2903.11(A)(1), a second-degree felony.

**{¶ 3}** The trial court held a jury trial beginning on August 14, 2018. The victim, Y.H., died before trial, so she did not testify. Instead, the state presented the testimony of a clerk for the Toledo Police Department ("TPD"); Y.H.'s son, Z.S., who was 11 years old at the time of the incident and 12 years old at the time of trial; a nurse practitioner who treated Y.H.; two TPD detectives; and an analyst from the Ohio Bureau of Criminal Investigation ("BCI"). Chambers also testified in his own behalf. The following facts were adduced at trial.

**{¶ 4}** Chambers and Y.H., who were in a relationship, and Z.S. lived together in a duplex in Toledo. Z.S. recalled living on the first floor of the building, although other witnesses—including Chambers—said that they lived on the second floor. Sometime between the evening of December 6, 2017, and the morning of December 7, 2017, Chambers and Y.H. were involved in an altercation. Although the timeline presented by Z.S. was not entirely clear, he testified that he was woken around 9:30 p.m. on December 6 by Chambers yelling at his mother that she should not be cheating on him and to stop leaving the house without telling him. When the yelling stopped, Z.S. heard "[l]oud pounding" that he assumed was "the floor banging against each other with my mom." He also heard moaning from his mother. When the yelling and pounding stopped, Z.S. went to the living room and "saw everything was knocked over * * *." He

2.

grabbed his phone to contact someone, but, as it was around 10:00 p.m., Z.S. believed that the police station was closed and his uncle would be sleeping. Chambers saw Z.S. with his phone and took the phone away, claiming that it needed to be charged.

{¶ 5} Chambers apparently went back into the bedroom that he and Y.H. shared because Z.S. next recalled Chambers walking out of the bedroom with Z.S.'s phone. At that point, Z.S. saw Y.H. trying to crawl out of the bedroom, but Chambers "grabbed her and dragged her back in the room." Z.S. returned to his room. He testified both that he did not hear anything further from Chambers or Y.H. and that the argument went on until 5:00 a.m. on December 7.

{¶ 6} At 6:00 a.m. on December 7, Z.S. woke up for school. He said that Y.H. was "limping and holding the walls" as she walked around the house that morning, but it was dark, so he could not see her face.

{¶ 7} Chambers drove Z.S. to school that day, and, on the way, Z.S. asked him why he threatened to kill Y.H. and her father. Chambers said it was "just talk." Z.S. also asked about the pounding and moaning that happened the night before. Chambers responded that Y.H. had fallen down the stairs. Z.S. did not believe Chambers.

{¶ 8} When Y.H. picked Z.S. up from school on December 7, she was wearing a mask (which Z.S. described as a "doctor mask") that prevented Z.S. from seeing her face. He said that she was talking "like a kazoo" and he had difficulty understanding what she was saying.

3.

{¶ 9} Z.S. also testified that he saw his mother's bed on December 7 and it looked like "dots of, like, somebody spilled Hawaiian Punch on the bed." He claimed that the dots were not there on December 6.

{¶ 10} According to Z.S., Y.H. went to the hospital three days later and had wires put in her mouth "[b]ecause her jawline was messed up." He recalled her being in the hospital for two days. He said that a photograph that the state admitted into evidence showing Y.H. with a large bruise on the left side of her face accurately depicted his mother as she looked after December 6, 2017.

{¶ 11} Y.H. and Z.S. continued to live at the duplex with Chambers "for, like, a month" after December 6. Sometime after Christmas, Z.S. told some of his family members what had happened between Chambers and Y.H., and the family members intervened to help Y.H. At the time Y.H. and Z.S. left the duplex, Z.S. said, Y.H. was still having trouble walking and still had wires in her mouth. He recalled that the wires were removed before Y.H. died on February 20, 2018.

{¶ 12} Following Y.H.'s death, Z.S. left Toledo, where he had lived his whole life, to move to Tennessee to live with his sister.

{¶ 13} On cross, Z.S. said that police did not meet with him to discuss the incident until after his mom died. Detective Theresa Talton of the TPD domestic violence unit, who took over the investigation of this case when the original detective retired, explained that Y.H. identified Z.S. as a witness when she made her initial report to the police, but the TPD does not generally interview children who witness domestic violence incidents

4.

to avoid further traumatizing them.  In this case, however, Talton's predecessor had to interview Z.S. after his mother died because "he was a witness and [Y.H.] was no longer able to speak for herself * * *."

{¶ 14} Stephanie Hutchison, a trauma nurse practitioner who treated Y.H. at the hospital, testified that she treated Y.H. on December 13, 2017—one week after the incident.  She diagnosed Y.H. with a closed fracture of the left mandible and a laceration of the upper lip with complication.  The "complication" was a "shattered" tooth.  The jaw fracture had "100% displacement laterally," which Hutchison described as "imagine snapping a pencil, it's completely broken in half * * *."

{¶ 15} When Hutchison first saw Y.H., Hutchison thought that Y.H. had been crying and that she seemed afraid.  Y.H.'s face was swollen and she had "an obvious deformity to her jaw * * *."  Hutchison also noticed a foul odor that she eventually traced to Y.H.'s broken tooth.  In her experience, Hutchison said, open wounds did not emit an odor until three days to two weeks after the injury.  This told Hutchison that Y.H.'s injuries had not happened immediately before Y.H. came to the hospital.  Y.H. explained this delay to Hutchison by saying that she was "finally able to leave" and "wasn't allowed to go" before then.  Y.H. said she was with her boyfriend from the time she was injured until she went to the hospital.

{¶ 16} While Hutchison was examining Y.H., Y.H.'s boyfriend—who Hutchison identified as Chambers—and Z.S. came into the room.  Chambers asked Hutchison who she was and why she was there.  He seemed "a little standoffish, angry is the word.

5.

Didn't like [Hutchison] being in the room, that's for sure." Hutchison did not speak to Chambers because Y.H. had asked her not to.

{¶ 17} When Hutchison asked, Y.H. said she hurt her jaw by twice falling off an air mattress and hitting a chair. Hutchison did not believe this explanation because "if you're, I don't know, like, three-inches [sic] off of the floor and you, somehow, then strike a chair on the way down, that just—it doesn't add up, doesn't make sense." She also said that Y.H.'s explanation was inconsistent with her injury. Although Y.H. acknowledged that her explanation did not make sense, she insisted that she hurt her jaw by falling off of an air mattress. After further questioning, Hutchison was able to determine that Y.H. and her boyfriend had had an argument the day Y.H. was hurt. Throughout this conversation, Hutchison said that Y.H. was tearful and would not make eye contact with Hutchison.

{¶ 18} Y.H.'s medical records, which were admitted into evidence, show that Y.H. gave a different explanation for her injuries to the doctor who initially evaluated her. Y.H. stated that she hurt herself when she fainted and fell, and that she waited to come to the hospital because it was the first day she was able to drive. Y.H. denied that she was abused. Hutchison said that Y.H.'s inconsistent story and being upset about her boyfriend made Hutchison think that Y.H. was assaulted.

{¶ 19} Generally, a jaw fracture does not require a hospital stay, but Hutchison wanted to keep Y.H. overnight to see if she or one of the nurses could find out what really happened to Y.H. Y.H. refused. She said she needed to go home to make sure that

6.

her son was safe. Y.H. also refused Hutchison's offer to have a hospital social worker consult with Y.H.

{¶ 20} Two weeks later, on December 27, 2017, Y.H. went to the police station to report that she had been assaulted on December 6 or 7. Rayni Robinson, a civilian clerk for the TPD, testified that Y.H. reported that the man she was in a relationship with had broken her jaw while she was sleeping. Y.H. named Chambers as the perpetrator.

{¶ 21} Detective Talton was the investigating officer who testified at trial. She said that her predecessor had done much of the investigation of the case, but Detective Talton reviewed the reports, information pulled from Y.H.'s cellphone, and recorded interviews with Y.H. and Z.S. Among the items taken from Y.H.'s cellphone were a series of text messages that Chambers sent to Y.H. on December 24, 2017. Following several messages telling Y.H. to come home, Chambers sent a message that read, "U got bout 5 min imma tear everything up in this bitch and gone kill your dog [sic]." Detective Talton found this message significant because she saw it as Chambers attempting to exercise power and control over Y.H.

{¶ 22} Detective Talton was also responsible for assisting Martin Rocha, a detective in the TPD's scientific investigation unit, in executing a search warrant for Y.H.'s home and obtaining a DNA sample from Chambers. Detective Rocha executed a search warrant for the second floor of the duplex on March 7, 2018, three months after the fight between Chambers and Y.H. and more than two months after Y.H. and Z.S. moved out of the house. He knew going into his investigation that "the scene had been

7.

altered from * * * when the original incident occurred." In one of the bedrooms of the duplex, Detective Rocha found a debit card with Y.H.'s name on it, a wallet containing a debit card with Chambers's name on it, and three stains that he believed were bloodstains.

{¶ 23} The first stain was under a deflated air mattress. Detective Rocha testified that it looked like someone had attempted to clean up blood that had pooled in that area. He conducted a presumptive blood test on the stain, which came back positive for blood. He then swabbed the stain so that the blood could be sent for DNA testing. Katharine Dailey, a forensic scientist with BCI, tested the samples Detective Rocha collected. She testified that the blood in the first sample contained a mixture of DNA with Y.H.'s DNA profile being more prevalent. The other DNA profile in the mixture was not suitable for comparison, which means that the DNA was of insufficient quality or quantity for further analysis.

{¶ 24} The second stain was on the wall near the first stain. Detective Rocha believed the blood had been transferred to the wall when someone or something touched the wall. He swabbed the stain so that the blood could be sent for DNA testing. Dailey testified that the blood in the second sample contained a mixture of DNA from Y.H. and Chambers. On cross, Dailey admitted that there is no way to determine the age of a sample based on the DNA profile or to tell if both contributors to a mixture left their DNA at the same time.

8.

{¶ 25} The third stain was near the light switch in the bedroom. Detective Rocha swabbed the stain so that it could be sent for DNA testing. Dailey testified that the sample did not contain blood.

{¶ 26} Following the state's presentation of evidence, Chambers testified in his own behalf. He described his relationship with Y.H. as "lovers and friends" and said that they had been together since the summer of 2016. He was "hurt" when Y.H. died of heart failure.

{¶ 27} Regarding the events of December 6, 2017, Chambers recalled that he and Y.H. had a couple of drinks after Chambers got home from work. Later, Y.H. left the house to visit her cousin and returned around 9:00 or 10:00 p.m. After Y.H. came home, Chambers said she "got in her vocal state" and was "talking reckless" because Chambers was not listening to her. He said that she was "talking, you know, like she usually do when she's intoxicated, you know, overly intoxicated. I could tell that was the deal with her." Chambers left the bedroom, where they had been "chilling," and Y.H. followed him. She knocked over a video game system and a cable box in the living room and then went back into the bedroom.

{¶ 28} When Y.H. went back into the bedroom, Chambers remained in the living room and went to sleep on the couch. Later, Chambers went into the bedroom to find his phone and found Y.H. laying on the floor just inside the bedroom door. According to Chambers, the area where he found Y.H. was not the same area where Detective Rocha found blood on the floor in March 2018. Chambers helped Y.H. up, saying that she was

9.

"getting up groggy," and then attempted to clean up some spilled beer on the bedroom floor near where Y.H. had been. While he was cleaning up the beer, he heard a noise and assumed it came from Y.H. falling over. He said her cheek became swollen after that. He picked her up and helped her to bed. Y.H. did not complain about being in pain and did not give Chambers any indication that she needed to go to the hospital at that point. Instead, she went to sleep.

{¶ 29} During the week between Y.H. being injured and seeking medical treatment, Chambers said that they were doing "what we usually do," which included Y.H. driving Chambers to and from work. He was surprised to learn that Y.H. told hospital staff that December 13 was the first day she felt well enough to leave the house because she had been leaving the house regularly to take Chambers to work.

{¶ 30} Regarding the December 24 text message, Y.H. told Chambers that she lost her purse and keys, and Chambers did not believe her. He threatened the dog as a "tactic * * * to see how fast she get home" because he wanted to "copulate." He denied controlling her, however, saying she was a strong-willed woman. And although Chambers admitted slapping Y.H. one time, he denied breaking her jaw or ever hitting her hard enough to cause serious physical harm.

{¶ 31} On cross, Chambers denied many of the things Z.S. testified to, including threatening to kill Y.H. and her father, dragging Y.H. back into the bedroom, and telling Z.S. that Y.H. fell down the stairs.

10.

{¶ 32} Chambers maintained that he did not know that Y.H.'s jaw was broken until they went to the hospital on December 13. He did not notice a "dent" on her face until the weekend after December 6 and said that Y.H. attributed the dent to retaining water as a side effect of a medicine she was taking. Nor did he notice an odor coming from Y.H.'s mouth.

{¶ 33} Regarding the text message in which Chambers threatened to kill Y.H.'s dog, Chambers said that they "had our little words" that weekend and he was just trying to see if Y.H. was telling the truth about losing her purse and keys. He said that was the first time he had used such a tactic.

{¶ 34} After hearing the evidence, the jury found Chambers guilty of felonious assault. The trial court sentenced him to 8 years in prison.

{¶ 35} Chambers now appeals the trial court's sentence, raising two assignments of error:

I. APPELLANT'S CONVICTION FOR FELONIOUS ASSAULT WAS BASED ON INSUFFICIENT EVIDENCE.

II. APPELLANT'S CONVICTION FOR FELONIOUS ASSAULT WAS AGAINST THE MANIFEST WEIGHTOF [sic] THE EVIDENCE.

## II. Law and Analysis

### A. Chambers's conviction is supported by sufficient evidence.

{¶ 36} In his first assignment of error, Chambers argues that his conviction is not supported by sufficient evidence because he was convicted based on the incompetent

testimony of Z.S. and questionable blood evidence. Chambers contends that we should find that Z.S. was incompetent to testify because of his age and the stressful events that preceded his testimony. He also claims that the blood evidence should be disregarded because it was gathered long after the injuring event from a scene that was "substantially changed from the time of the original incident." The state responds that Z.S. was competent to testify and the evidence supported the conviction.

{¶ 37} In reviewing a challenge to the sufficiency of the evidence, we view the evidence in a light most favorable to the prosecution and determine whether "any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." (Internal citations omitted.) *State v. Smith*, 80 Ohio St.3d 89, 113, 684 N.E.2d 668 (1997). In making that determination, we will not weigh the evidence or assess the credibility of the witnesses. *State v. Were*, 118 Ohio St.3d 448, 2008-Ohio-2762, 890 N.E.2d 263, ¶ 132. Whether there is sufficient evidence to support a conviction is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997).

{¶ 38} Chambers was convicted of felonious assault under R.C. 2903.11(A)(1), which requires the state to prove that Chambers knowingly caused serious physical harm to Y.H. As pertinent here, "serious physical harm" includes physical harm that involves "some temporary, substantial incapacity," "some temporary, serious disfigurement," or "acute pain of such duration as to result in substantial suffering * * *." R.C. 2901.01(A)(5)(c)-(e).

12.

{¶ 39} The evidence presented at trial showed that Z.S. heard Chambers yelling at Y.H. and "[l]oud pounding" on the night of December 6. Following the loud pounding, Z.S. heard his mother moaning. Later in the night, Z.S. saw Chambers drag Y.H., who was crawling out the bedroom door, back into the bedroom. The next day, Y.H. was using walls for support when she walked, talking strangely, and wearing a mask to prevent Z.S. from seeing the significant bruising on her face.

{¶ 40} A week after the fight Z.S. heard, Y.H. sought medical treatment and learned that her jaw was, essentially, "completely broken in half * * *." She also had a "shattered" tooth. Although Y.H. blamed the injury on falling off of an air mattress into a chair, Hutchison, the nurse practitioner who treated Y.H., said that explanation did not make sense. Y.H. reported to a different treatment provider that she hurt herself by falling after fainting. Y.H.'s injuries required her to have her jaw wired shut for some period of time that was, at most, two months.

{¶ 41} Additionally, Z.S. testified to seeing dots of what looked like "Hawaiian Punch" on Y.H.'s bedsheets on December 7, the day after the fight, which were not there prior to December 7. Three months later, the TPD discovered bloodstains in the bedroom where Chambers and Y.H. were during the fight. The stains were found three months after the fight and more than two months after Chambers, Y.H., and Z.S. moved out of the duplex. Chambers's and Y.H.'s DNA was found in the bloodstains. Dailey, the DNA analyst, admitted that she could not tell when the blood was deposited in the bedroom or whether the stains were made at the same time.

13.

{¶ 42} In response to this evidence, Chambers testified that he was unsure when or how Y.H. hurt her jaw, but that she had fallen over while drunk on December 6. He claimed that she was fine until December 13 when she asked to go to the hospital.

{¶ 43} Taken together, this evidence is sufficient to show that Chambers caused serious physical harm to Y.H. Y.H. was apparently fine before 9:30 p.m. on December 6, 2017. But following a fight with Chambers that included "[l]oud pounding," Y.H. was moaning, unable to walk properly, unable to speak clearly, and had significant bruising on her face, which ultimately proved to be from a broken jaw. Y.H. lost a tooth and had her jaw wired shut as a result of the altercation. These injuries constitute "some temporary, substantial incapacity," "some temporary, serious disfigurement," or "acute pain of such duration as to result in substantial suffering * * *." R.C. 2901.01(A)(5)(c)-(e). *See State v. Walter*, 1st Dist. Hamilton No. C-060279, 2006-Ohio-6448 (serious physical harm found when victim's jaw was broken, he lost two teeth, and required plastic surgery); *State v. Lipkins*, 6th Dist. Lucas No. L-95-133, 1996 WL 339916 (June 21, 1996) (a broken jaw constituted serious physical harm because the victim's jaw was sore and swollen, he suffered pain, his mouth was wired shut, and his jaw did not align properly when it healed).

{¶ 44} Chambers's primary argument under this assignment of error is that Z.S. was not competent to testify, so his testimony is insufficient to support a guilty verdict. Under Evid.R. 601, "Every person is competent to be a witness except: (A) Those of unsound mind, and children under ten years of age, who appear incapable of receiving

14.

just impressions of the facts and transactions respecting which they are examined, or of relating them truly." Even though Z.S. was 12 years old at the time of trial, Chambers argues that Z.S.'s confusion about whether he lived on the first or second floor of the duplex, combined with the death of his mother and his subsequent move to live with his sister in another state, made Z.S.'s competence to testify "a rebuttable presumption for the state to prove." We disagree.

{¶ 45} "A plain reading of Evid.R. 601(A) leads to the conclusion that the competency of individuals ten years or older is presumed * * *." *State v. Clark*, 71 Ohio St.3d 466, 469, 644 N.E.2d 331 (1994). Accordingly, any person over the age of 10 is per se competent to testify, "absent some articulable concern otherwise * * *." *Id.* That is, "once a child attains the age of ten, the presumption of competency created by Evid.R. 601(A) applies equally to that child witness as it would to any adult * * *." *Id.* at 471.

{¶ 46} The record shows that Z.S. was 12 years old at the time of trial. Thus, he was presumed competent to testify. Chambers did not argue otherwise in the trial court, so there is nothing in the record to support his argument on appeal that Z.S. was per se an incompetent witness.

{¶ 47} Moreover, Chambers's arguments regarding Z.S.'s competence as a witness actually relate to the accuracy of his testimony. Whether a child-witness's testimony is *accurate*—as opposed to whether the child is competent to testify—is an issue of credibility for the trier of fact to resolve. *Id.* And, like any other credibility determination, the credibility of Z.S.'s testimony "hinges upon the perceived accuracy

15.

and truthfulness with which the testimony is given." *Id.* Here, the jury perceived Z.S.'s testimony as credible—despite the inaccuracies and the circumstances in Z.S.'s life—which we cannot review under a sufficiency-of-the-evidence challenge.

{¶ 48} Chambers also points to reliability issues regarding the DNA evidence to show that the evidence is insufficient to support a guilty verdict. Again, his argument focuses on the accuracy, or weight, of the DNA evidence. As discussed above, when the DNA evidence is considered alongside the other evidence presented at trial—which includes defense counsel's questioning of Dailey regarding the limitations of the DNA evidence—and the totality of the evidence is construed in favor of the state, we find that the evidence is sufficient to support the guilty verdict.

{¶ 49} Chambers's first assignment of error is not well-taken.

**B. Chambers's conviction is not against the weight of the evidence.**

{¶ 50} In his second assignment of error, Chambers argues that his conviction is against the manifest weight of the evidence because of the incompetence of Z.S.'s testimony and the questionable DNA evidence. The state responds that the jury was free to believe Z.S.'s testimony and the supporting testimony from other witnesses and did not clearly lose its way by doing so.

{¶ 51} When we review a claim that a verdict is against the manifest weight of the evidence, we weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way in resolving evidentiary conflicts so as to create such a manifest miscarriage of justice that the

16.

conviction must be reversed and a new trial ordered. *Thompkins,* 78 Ohio St.3d at 387, 678 N.E.2d 541. We do not view the evidence in a light most favorable to the prosecution. "Instead, we sit as a 'thirteenth juror' and scrutinize 'the factfinder's resolution of the conflicting testimony.'" *State v. Robinson,* 6th Dist. Lucas No. L-10-1369, 2012-Ohio-6068, ¶ 15, citing *Thompkins* at 387. Reversal on manifest weight grounds is reserved for "the exceptional case in which the evidence weighs heavily against the conviction." *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).

{¶ 52} Although we consider the credibility of witnesses under a manifest-weight standard, we must, nonetheless, extend special deference to the jury's credibility determinations, given that it is the jury that has the benefit of seeing the witnesses testify, observing their facial expressions and body language, hearing their voice inflections, and discerning qualities such as hesitancy, equivocation, and candor. *State v. Fell*, 6th Dist. Lucas No. L-10-1162, 2012-Ohio-616, ¶ 14. The jury, as the finder of fact and the sole judge of the weight of the evidence and the credibility of the witnesses, may believe or disbelieve all, part, or none of a witness's testimony. *State v. Caudill*, 6th Dist. Wood No. WD-07-009, 2008-Ohio-1557, ¶ 62, citing *State v. Antill*, 176 Ohio St. 61, 67, 197 N.E.2d 548 (1964).

{¶ 53} After reviewing the evidence and the credibility of the witnesses and weighing the testimony, we are not convinced that the evidence weighs heavily against a conviction. We cannot say that the jury lost its way or created a manifest miscarriage of

17.

justice by believing Z.S.'s testimony, despite the inconsistencies and surrounding circumstances. The fact that the jury believed the testimony of a child—in and of itself—does not lead to the conclusion that the jury lost its way. Moreover, even if we give little or no weight to the DNA evidence due to the problems with its reliability, we cannot find that the remaining evidence weighs heavily against a conviction. We find, therefore, that Chambers's conviction is not against the manifest weight of the evidence. Thus, his second assignment of error is not well-taken.

### III. Conclusion

{¶ 54} For the foregoing reasons, the August 17, 2018 judgment of the Lucas County Court of Common Pleas is affirmed. Chambers is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Arlene Singer, J.                          _____
                                                            JUDGE
Thomas J. Osowik, J.

Christine E. Mayle, P.J.                  _____
CONCUR.                                                    JUDGE

                                          _____
                                                            JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.