[Cite as *State v. Schmid*, 2025-Ohio-14.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
GREENE COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Appellee | : | C.A. No. 2024-CA-16 |
| | : | |
| v. | : | Trial Court Case No. 2023CR0130 |
| | : | |
| JOHN T. SCHMID | : | (Criminal Appeal from Common Pleas |
| | : | Court) |
| Appellant | : | |
| | : | |

. . . . . . . . . . .

O P I N I O N

Rendered on January 3, 2025

. . . . . . . . . . .

THOMAS W. KIDD, JR., Attorney for Appellant

MEGAN A. HAMMOND, Attorney for Appellee

. . . . . . . . . . . .

EPLEY, P.J.

{¶ 1} Defendant-Appellant John T. Schmid appeals from his convictions in the Greene County Court of Common Pleas of aggravated burglary, felonious assault, attempted trespass in a habitation, and two counts of misdemeanor assault. For the

reasons that follow, the judgment of the trial court will be affirmed.

I.  **Facts and Procedural History**

{¶ 2} Just after midnight on February 24, 2023, Terry, the resident of a house on Old Yellow Springs Road in Fairborn, was awake and listening to an audiobook when he heard what sounded like a car's engine revving nearby. A few minutes later there was a big bang, and he found that someone was trying to kick in his front door. Terry could not see who was there (as he is legally blind), but he banged back on the door and yelled "whoa, whoa, whoa." The kicking stopped, but the person on the other side yelled, "This is your neighbor. Open the door. I just had an accident." Not recognizing the voice, Terry refused to let the person in and instead called 911. The person at the door left.

{¶ 3} At about that same time, D.S., the owner of a house on Cedarwood Drive in Fairborn (very near Terry's house) was on the couch in his living room when he heard a big boom and, as he put it, the next thing he knew, "here comes this person into my house." Once inside, the intruder attacked D.S., initially headbutting him in the torso. Though surprised, D.S. was able to push the man (later identified as Schmid) out the door and onto the porch, causing Schmid to fall. D.S. testified: "I stood over him and I was yelling as loud as I could. . . I was trying to reach anybody who could hear me." Trial Tr. at 70. He also asked Schmid what gave him the right to break into his house in the middle of the night, and Schmid replied that he needed help and that he was Jesus.

{¶ 4} After the short exchange, Schmid got up and slowly began to move toward D.S., who was now just inside the threshold of the house. According to D.S., "[i]t got to the point where I couldn't trust him no more. And then, that's [when] I put my hands on

him. I pushed him. And we ended up falling over a fence into the yard." Trial Tr. at 72. Schmid landed on top of D.S. and was able to hook his thumbs on the inside of D.S.'s mouth and pulled violently outward. D.S. told officers that "[Schmid] tried to pull my mouth apart." Exhibit 5 (body camera video). He testified that it took all of his strength to keep the attacker off of him because Schmid was trying to bite his neck.

{¶ 5} D.S.'s wife, who had been asleep upstairs, came down and began yelling at Schmid. That distraction led Schmid to get off of D.S. and instead head for D.S.'s wife. She testified that "[Schmid] jumped up and grabbed me by the breasts real hard and shoved me." Trial Tr. at 97. After the brief attack on D.S.'s wife, Schmid went back to the assault on D.S. By this time, however, neighbors had heard the commotion and were arriving on scene. One neighbor, Rick, went outside and saw D.S. "bent over the fence; his wife standing next to him . . . screaming at a gentleman, telling him to leave the property." Trial Tr. at 32. Rick began to walk that way and got Schmid's attention; Schmid then abandoned his assault on D.S. and ran toward Rick.

{¶ 6} The two men fought, both exchanging blows, but Rick got the better of Schmid and was able to subdue him until police arrived. Once officers got there, Rick let Schmid go. Schmid then turned his attention to Fairborn police officer Austin Henning, who had just arrived on the scene. Officer Henning testified that Schmid walked right at him and "put his hands towards my chest and face area and didn't stop walking towards me, so, I had to redirect him towards my patrol car." Trial Tr. at 50-51. A struggle ensued, and they began to wrestle on the ground. At this point, more officers arrived, and Schmid was finally put in handcuffs and dragged to a cruiser because he refused to walk.

{¶ 7} Officer Henning testified that throughout the altercation, Schmid yelled things like "break my arm." According to Officer Henning, he also asked, "God, why did you make me do this?" Trial Tr. at 57. The officer told the jury that, as Schmid was being taken in custody, "he asked if I wanted him to kill me. And then, he asked if I wanted him to slit my throat. And then, he said that he would eat me." Trial Tr. at 60; Exhibit 5. He also requested to be set on fire and crucified upside down. Exhibit 5.

{¶ 8} Others witnessed Schmid's acting and speaking strangely. Rick told the jury that as he walked away after law enforcement officers finally got Schmid under control, Schmid stated that he was Jesus Christ and had died for his sins. Greene County Deputy Nathaniel Slone recalled that, as he was trying to confirm Schmid's identity, Schmid told him that he was Saint Teresa. Deputy Slone also testified that Schmid called him names like "whistle dick," "dick sickle," and "cream filling," all the while using an Asian accent. Conversely, however, Schmid apologized while being handcuffed and said, "I'm sorry. I'm a stupid motherfucker. I deserve to die." Trial Tr. at 138, 180; Exhibit 5. Multiple witnesses reported hearing Schmid refer to himself as John the Baptist.

{¶ 9} Another law enforcement officer, Trooper Jason Whitner, testified that Schmid told him that he had "smoked some pot, cocaine, meth, and some crack." Trial Tr. at 115. At one point, Schmid told officers that he had ingested "everything," including cyanide. Trial Tr. at 185. Body camera footage showed Deputy Alex George asking Schmid about his address, to which Schmid replied that he lived on "Fuck You Street."

{¶ 10} Schmid was taken from the scene to the hospital, where he continued to have hostile and inappropriate interactions with everyone with whom he came in contact.

Deputy George told the jury that Schmid attempted to lick the face of a female EMS member. Neither officers nor medical personnel were able to collect any biological samples from Schmid due to his being "combative and uncooperative."

{¶ 11} Schmid was not the only person to be hospitalized. His victim, D.S., was taken to the hospital with head injuries. Evidence showed that he suffered from, among other things, a fractured jaw and a tear in the lining of his mouth. He described the skin on the inside of his mouth as being torn and flapping.

{¶ 12} Schmid was eventually charged with aggravated burglary, felonious assault, two counts of misdemeanor assault, aggravated menacing, and attempted trespass in a habitation. The aggravated menacing count was later dismissed.

{¶ 13} On March 23, 2023, Schmid entered a plea of not guilty by reason of insanity and asked the trial court to order both a competency and a sanity evaluation. The court granted the motion, and Schmid was evaluated by the Forensic Psychiatry Center for Western Ohio. A second sanity evaluation was later conducted as well. On August 17, the trial court found Schmid competent to stand trial after both parties stipulated to the report.

{¶ 14} The case proceeded to a jury trial on January 16, 2024. The jury heard testimony from the victims, neighbors, Schmid's family, and law enforcement officers. Pertinent to this appeal, they also heard testimony from two experts: Dr. Richard Bromberg, who believed Schmid was not guilty by reason of insanity, and Dr. Carla Dreyer, who did not. After several days of trial and then deliberation, the jury returned guilty verdicts on all counts.

{¶ 15} Schmid was sentenced to 11 to 16½ years for aggravated burglary, 8 years for felonious assault, 180 days for each assault, and 12 months for attempted trespass in a habitation. The court ordered all the sentences to be served concurrently for an aggregate sentence of 11 to 16½ years in prison.

{¶ 16} Schmid filed a timely appeal, raising three assignments of error.

**II.     Manifest Weight and Insanity Defense**

{¶ 17} In his first assignment of error, Schmid asserts that the weight of the evidence demonstrated that he was not guilty by reason of insanity. He believes that the jury lost its way when it reached the conclusion that he did not prove his insanity defense.

{¶ 18} According to the statute, a person is not guilty by reason of insanity if "at the time of the commission of the offense, the person did not know, as a result of a severe mental disease or defect, the wrongfulness of the person's acts." R.C. 2901.01(A)(14). This is an affirmative defense, which means the defendant bears the burden of establishing that he or she is not guilty by reason of insanity (NGRI). R.C. 2901.05(A); *see State v. Tibbetts*, 92 Ohio St.3d 146, 164-165 (2001).

{¶ 19} The NGRI defense must be proven by a preponderance of the evidence. R.C. 2901.05(A); *Tibbetts* at 165. "Preponderance of the evidence simply means 'evidence which is of a greater weight or more convincing than the evidence which is offered in opposition to it.' " *In re Starks,* 2005-Ohio-1912, ¶ 15 (2d Dist.), quoting *Black's Law Dictionary* (6th Ed.1998).

{¶ 20} The evidentiary support for an NGRI defense should be analyzed in the context of a manifest weight standard. *State v. Cochran*, 2017-Ohio-216, ¶ 51 (2d Dist.).

"The weight to be given the evidence and the credibility of the witnesses concerning the establishment of the defense of insanity in a criminal proceeding are primarily for the trier of the facts." *State v. Thomas*, 70 Ohio St.2d 79 (1982).

{¶ 21} When an appellate court reviews whether a conviction is against the manifest weight of the evidence, "[t]he court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist. 1983). A case should not be reversed as being against the manifest weight of the evidence except " 'in the exceptional case in which the evidence weighs *heavily* against the conviction.' "  (Emphasis added.) *Id.*

{¶ 22} In this case, both parties – and their experts – agreed that at the time of the crimes, Schmid was suffering from a severe mental disease. Schmid's expert, Dr. Bromberg, testified that Schmid suffered from schizoaffective disorder. He described it as "a thinking disorder and a mood disorder that is coming together. I call it the perfect storm. . . . You're out of touch with reality and your mood is absolutely unpredictable." Trial Tr. at 455. According to Dr. Bromberg, Schmid also had obsessive compulsive disorder. Additionally, in the years leading up to the crimes, Schmid was being treated by his family doctor for "bipolar disorder, which encompasses both depression and anxiety." Trial Tr. at 358. Where the parties' opinions diverged, and what makes the difference in this appeal, is whether Schmid knew the wrongfulness of his actions in the early morning

hours of February 24, 2023.

{¶ 23} Dr. Bromberg testified that he had spent five hours evaluating Schmid and administered several psychological tests, including the Rogers Criminal Responsibility Assessment Scale, or R-CRAS. This test, according to Dr. Bromberg, is "a structured evaluation of sanity" and tries to measure if the person meets the legal standard of insanity. Two other tests were employed: the Minnesota Multiphasic Personality Inventory (MMPI) and the Personality Assessment Inventory (PAI). The MMPI did not show a significant amount of pathology, but the PAI, which was administered approximately three hours into the session, showed more.

{¶ 24} Dr. Bromberg recounted that, after several hours of interviewing him, "[S]chmid began to start to reveal some of his thinking . . . and it was pretty bizarre." Trial Tr. at 434. Dr. Bromberg noted that Schmid's thinking was out of touch with reality. "[H]e began to confuse who he was in his recollection of whether he was Jesus; whether he was sent by Jesus and empowered by Jesus; or, whether he had some of Satan within him." Trial Tr. at 435. According to Dr. Bromberg, on the night of the incident(s), Schmid "really didn't have an idea as to his whereabouts. When he walked into the house, he didn't seem to have any idea where he was." Trial Tr. at 435. He had no idea of time and "wasn't oriented by who he was; by where he was; by the time; and wasn't oriented by circumstance. All he knew was that he was supposed to go and to heal people and try to exorcize the demons out of these people." Trial Tr. at 436.

{¶ 25} In addition to talking with and administering tests to Schmid, Dr. Bromberg reviewed hospital records (both pre- and post-incident), legal records, and police reports.

He also reported having interviewed Schmid's parents and former fiancée. The medical records showed a history of hospitalizations due to mental distress dating more than a decade and included inpatient stays in 2008, 2010 and 2016. Documents from Miami Valley Hospital indicated that Schmid had been drinking out of the toilet and spreading feces on the walls of his jail cell. Trial Tr. at 441.

{¶ 26} Ultimately, Dr. Bromberg opined that when he evaluated Schmid in October 2023, he had exhibited "extreme psychological impairment," and Dr. Bromberg diagnosed him with schizoaffective disorder combined with obsessive compulsive disorder. It was his opinion that Schmid had suffered from these psychoses at the time of the offense. Dr. Bromberg testified that on February 24, 2023, Schmid thought he was doing the right thing. "John wanted to do one thing. He wanted to heal these people. He wanted to get the devil out of them. . . [H]e believed that he was in the right to do what he did because . . . he believed that he was sent by Jesus." Trial Tr. at 456-457. It was Dr. Bromberg's opinion that Schmid did not know the wrongfulness of his actions.

{¶ 27} The State's expert, Dr. Dreyer, felt differently. She met face-to-face with Schmid for a one-hour clinical interview and also met with the prosecutor and defense counsel, reviewed the police reports and jail records, and reviewed treatment records from multiple hospitals. She ultimately concluded that Schmid did not meet the criteria for not guilty by reason of insanity. She noted that Schmid was likely mentally ill at the time of the crimes, but she believed that he knew the wrongfulness of his behavior. "There was no data to indicate that he did not know the wrongfulness. His behavior was instead impulsive . . . but there was no indication that he did not know the behavior was wrong. It

was more that he couldn't control his behavior." Trial Tr. at 541-542; *see also* Trial Tr. at 572.

{¶ 28} Schmid's argument on appeal seems to be that Dr. Bromberg's assessment and opinion should hold more weight than Dr. Dreyer's because Dr. Bromberg spent more time with him and did more clinical tests on Schmid than his counterpart. However, the jury could have just believed Dr. Dreyer to a greater extent, and indeed, her testimony discredited some of Dr. Bromberg's findings. For example, the defense put a great deal of weight on the psychological testing done during Schmid's time with Dr. Bromberg, but Dr. Dreyer opined that any test done months after the incident could not show what Schmid's mental state was on February 24, 2023. She told the jury that she did not do the MMPI personality test because the question she had to answer for the court was not about his personality but his mental state at the time of the offense. "Unless I gave the MMPI the day he committed the offenses, it wouldn't really tell me anything about his mental state at the time." Trial Tr. at 528.

{¶ 29} Dr. Dreyer had an even stronger negative opinion about the R-CRAS test, which was a pillar of Schmid's insanity claim. She told the jury that the test is not widely accepted in the field of forensic psychology and, in fact, she had never seen it used in a forensic center. Trial Tr. at 533. According to Dr. Dreyer, it cannot be useful in Ohio because it is based upon a NGRI standard not used in this state. "[E]ssentially, [the R-CRAS] it's the McNaughton standard. So, it's the wrongfulness prong with a very strict insanity standard in Ohio and the R-CRAS does not address that. It's not validated for that standard. And so, it's inappropriate to use in that regard, so, people don't use it." Trial

Tr. at 533. Even Dr. Bromberg admitted on cross-examination that the awareness of the wrongfulness of the act cannot be measured by the R-CRAS test. He also conceded that the other tests he gave Schmid only measured his mental state at the time of the test, not on February 24, 2023.

{¶ 30} Because there was competing testimony as to Schmid's ability to ascertain the wrongfulness of the act(s), and "the record demonstrates that the jury considered the insanity defense, a reviewing court should defer to the jury's interpretation of the evidence." *State v. Self*, 2005-Ohio-1259, ¶ 13 (4th Dist.). *See also State v. Mitchell,* 2016-Ohio-7691, ¶ 19 (2d Dist.) (concluding that the jury did not lose its way when it credited one expert's testimony over another); *State v. Petrie*, 2016-Ohio-4941, ¶ 17 (9th Dist.) (holding that due to conflicting expert testimony, "the evidence in this case is balanced, and in these circumstances, we cannot say this is the exceptional case in which we must reverse[.]"); *State v. Doseck*, 1995 WL 324645 (2d Dist. Apr. 26, 1995) ("A trial court's judgment as to insanity, will only be reversed where overwhelming and uncontradicted evidence leads to a contrary conclusion."). Because we cannot say the jury lost its way, creating a manifest miscarriage of justice, Schmid's first assignment of error is overruled.

### III. Felonious Assault

{¶ 31} In his second assignment of error, Schmid contends that his conviction for felonious assault was against the manifest weight of the evidence and supported by insufficient evidence.

{¶ 32} "An appellate court's function when reviewing the sufficiency of the

evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt." *State v. Marshall*, 2010-Ohio-5160, ¶ 52 (2d Dist.), quoting *State v. Jenks*, 61 Ohio St.3d 259 (1991), paragraph two of the syllabus. "The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *Id.* A conviction based on legally insufficient evidence constitutes a denial of due process and will bar a retrial. *State v. Thompkins*, 78 Ohio St.3d 380, 386-387 (1997).

{¶ 33} A person is guilty of felonious assault if he or she knowingly (1) causes serious physical harm to another or another's unborn, or (2) causes or attempts to cause physical harm to another or to another's unborn by means of a deadly weapon or dangerous ordinance. R.C. 2903.11(A)(1)-(2).

{¶ 34} The Ohio Revised Code defines "serious physical harm" as "[a]ny physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity, [a]ny physical harm that involves some permanent disfigurement or that involves some temporary, serious disfigurement, [or a]ny physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain." R.C. 2901.01(A)(5)(c)-(e).

{¶ 35} Schmid argues (in both his sufficiency and manifest weight sections) that the record does not support that he caused serious physical harm to D.S.

{¶ 36} As described earlier by both D.S. and his wife, Schmid grabbed a hold of

D.S.'s mouth, inserted his thumbs, and with them hooked onto the inside of D.S.'s cheeks, violently pulling them outward. As a result of the altercation, D.S. was transported to the hospital where he was diagnosed with a fractured jaw and tear in the lining of his mouth. He described the skin on the inside of his mouth as being "torn and flapping." He also testified that he suffered pain as a result of his injuries. In addition to the trial testimony, the State presented photographs taken at the hospital showing cuts and abrasion to D.S.'s swollen lips and blood seeping out of his ear. Exhibits 9-12.

{¶ 37} After considering the record, we conclude that a broken jaw and a tear in the lining of the mouth equates to serious physical harm, and courts from across the state have agreed with that finding. *See State v. Chambers*, 2019-Ohio-4819, ¶ 43 (6th Dist.) (broken jaw constituted "some temporary, substantial incapacity," "some temporary serious disfigurement," or "acute pain of such duration as to result in substantial suffering"); *State v. Walter*, 2006-Ohio-6448 (1st Dist.) (broken jaw and accompanying pain established that victim suffered serious physical harm); *State v. Lipkins*, 1996 WL 339916 (6th Dist. June 21, 1996). As such, Schmid's second assignment of error is overruled.

### IV.    Evidentiary Ruling

{¶ 38} In his final assignment of error, Schmid argues that the trial court erred in admitting evidence that he stopped taking medication before the crimes. He argues that allowing the jury to factor that into its decision led to his eventual conviction.

{¶ 39} Decisions regarding the admissibility of evidence are within the discretion of the trial court and will be upheld unless an abuse of discretion can be demonstrated.

*State v. Haines*, 2006-Ohio-6711, ¶ 50. "Abuse of discretion has been defined as an attitude that is unreasonable, arbitrary, or unconscionable. It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary." *State v. Malloy*, 2012-Ohio-2664, ¶ 24 (2d Dist.).

{¶ 40} A court's decision is unreasonable "if there is no sound reasoning process that would support that decision. It is not enough that the reviewing court, were it deciding the issue de novo, would not have found that reasoning process persuasive." *AAAA Ents., Inc. v. River Place Community Urban Redevelopment, Corp.*, 50 Ohio St.3d 157, 161 (1990).

{¶ 41} Schmid takes exception to an exchange between Schmid's father, Thomas, and the State during Thomas's cross-examination regarding Schmid's reportedly being off of his medication.

> Prosecutor**:** Did you have a conversation with your son, where he talked to you about deciding to stop taking that medicine that Dr. Gebhart had prescribed him?
>
> Thomas**:** John never decided to stop taking the medicine. He lost his medicine.
>
> Prosecutor**:** Would it surprise you that your son stated to one of the psychologists that evaluated him that he stated he decided to discontinue his psychotropic medicines one-and-a-half-weeks before the offenses[?] [A]nd when he was asked about such, he decided to ween himself off it

because he thought he could function without the medicine.

Trial Tr. at 341.

**{¶ 42}** During the ensuing sidebar, defense counsel argued that Schmid's not taking his medicine "does not come into play as evidence of guilt or make him guilty of the offenses. So, I don't think it's appropriate to get into whether he intentionally took his medicine or intentionally chose to not take his medicine[.]" Trial Tr. at 342. The State argued, as it does now, that the question to Thomas was not really trying to get to whether Schmid *actually* stopped taking his medicine, but rather to show the jury his inconsistent statements. The State also argues that Schmid opened the door to this line of questioning when, during the direct examination, Thomas and defense counsel had this exchange:

Thomas**:** We were – as a matter of fact, we asked him at that particular time, are you taking your medicine? . . . And he said that he was. He was taking his medicine. . . I think he – towards the end, he lost his medicine or something.

Defense Attorney**:** Okay. Is that what – what John told you, that in the beginning of February he had lost his medication?

Thomas**:** Yeah, he lost it. And I said, you know, well, you better find it; or talk to your doctor. And he said he was going to do that.

**{¶ 43}** After carefully examining the transcript and both parties' arguments, we cannot say that the trial abused its discretion by allowing the questioned testimony. Based on the transcript of what the jury heard, it does appear that the State was attempting to highlight the discrepancies in Schmid's statements regarding the cessation of his

medications. The trial court's decision was not unreasonable.

**{¶ 44}** Schmid's third assignment of error is overruled.

**V.      Conclusion**

**{¶ 45}** The judgment of the trial court will be affirmed.

. . . . . . . . . . . . .

LEWIS, J. and HUFFMAN, J., concur.